**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| *JOHN BOHEN* and *ABDALLAH NASSER*, individually, and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| *CONAGRA BRANDS INC.*, | |
| Defendant. | |

Plaintiffs, John Bohen and Abdallah Nasser ("Plaintiffs"), by their undersigned counsel, bring this class action complaint against Defendant ConAgra Brands Inc., ("Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to their acts and experiences, and as to all other matters, upon information and belief, including investigations conducted by Plaintiffs' attorneys.

## NATURE OF THE SUIT

1.      ConAgra charges a premium for its seafood Products[1] that uniformly promise to be "certified sustainable seafood" supported by a prominent certification from the Marine Stewardship Council ("MSC") in the form of a blue stamp (hereinafter the "Blue Tick") on the Product labels (hereinafter, the "Sustainability Promise").

---

[1] As described herein, Products refer to Mrs. Paul's Crispy Battered Fillets, Crunchy Breaded Fillets, Fish Sticks, Fish Fingers, and Beer Battered Fillets, as well as Van De Kamp's Crispy Battered Fillets, Crunchy Breaded Fillets, Fish Sticks, and Beer Battered Fillets sold nationwide. The labels of the different varieties of Products are substantially similar in the representations made to consumers.

2.     The prominent Sustainability Promise found on each and every Product label deceives and misleads reasonable consumers into believing the Products are sourced from sustainable fishing practices. However, ConAgra turns a blind eye to the unsustainable fishing practices used in sourcing its Products and deceptively uses the Sustainability Promise with the Blue Tick as proof of sustainable fishing methods. However, as ConAgra knew or should have known, MSC hands out this certification to those who use industrial fishing methods that injure marine life as well as ocean habitats with destructive fishing. MSC also allows its members to obtain their certification with a paid membership, creating a potential conflict of interest.

3.     Despite the MSC certification, ConAgra sources its Products using fishing practices that indiscriminately harm ocean ecosystems. ConAgra knows that conscientious consumers go shopping in search of sustainable products, which, in turn, drives market share. Reasonable consumers believe the fisheries providing these Products are maintaining healthy fish populations and protecting ecosystems. In fact, the MSC's standards themselves promise such protections of the oceans and marine life. However, MSC certified fisheries do not provide these promised protections and, instead, engage in the following conduct, which indisputably defies its promise of sustainability: the suffocation and crushing of sea lions, sharks, and whales caught in fishing nets that are then hauled onto fishing boats while severely injured or dead; the excessive capturing or harming of non-targeted prohibited species, such as snow crabs, and contributing to the failure of the populations.

4.     No reasonable consumer would believe the Products to be "sustainable" if they knew of these fishing practices utilized in sourcing the Products.

2

5.      In addition to violating the reasonable consumer's expectations with respect to sustainability, ConAgra knew or should have known that the Products are sourced in violation of its certifying body's—MSC's—*own standards*.

6.      Reasonable consumers are not required to look beyond the label representations to understand a company's label promises—here, the prominent Sustainability Promise. One need look no further than MSC's hollow promises of sustainability, which confirm a reasonable consumer's basic expectations of sustainability in purchasing allegedly "sustainable" products.[2]

7.      It, therefore, shocks the conscience to learn that ConAgra uses the hollow certification provided by MSC, an organization which ConAgra knows or should know blatantly violates its own standards and puts the very ecosystem MSC feigns to protect in serious danger.

8.      ConAgra's failure to ensure that the Sustainability Promise was truthful is a violation of the explicit promises that it made to consumers on each and every Product label. Consumers reasonably expect that ConAgra has the proper, company-wide monitoring in place to verify the explicit promise it made to consumers regarding the sustainability of the fishing practices used to source the Products. Instead, ConAgra failed to ensure that the fisheries only sourced using sustainable means, making its promises meaningless.

9.      Sadly, despite profiting off of the false and misleading Sustainability Promise, ConAgra does not promote the health and preservation of marine ecosystems—a basic pillar of sustainability. Indeed, ConAgra conceals the use of harmful fishing practices used for its Products, thereby making the Products more appealing to an ever-growing environmentally conscious consumer base. By failing to disclose that its Products are, sadly, unsustainably sourced through

---

[2] https://www.msc.org/en-us/about-the-msc (last visited Feb. 16, 2023) (highlighting protection of healthy fish populations, careful management of ecosystems, and adaptations to changing environmental circumstances).

the use of fishing methods that harm ocean habitats and marine life, ConAgra has induced reasonable consumers, like Plaintiffs and Class Members, to become unwitting participants in the very environmental crisis they attempt to avoid by purchasing and paying a premium for ConAgra's Products.

10.     Due to ConAgra's false and deceptive labeling, Plaintiffs and reasonable consumers purchased Products based upon their reliance on ConAgra's Sustainability Promise. Had Plaintiffs and Class Members been aware that ConAgra's fishing techniques used to source the Products are not sustainable, Plaintiffs and Class Members would not have purchased the Products or would not have paid more for the Products. Accordingly, Plaintiffs and Class Members have been injured by ConAgra's deceptive business practices.

## JURISDICTION AND VENUE

11.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy: (1) is a class action involving more than 100 class members, (2) involves members of a proposed class with citizens of states that are different from ConAgra's home state, and (3) exceeds the sum or value of $5,000,000, exclusive of interests and costs.

12.     This Court has personal jurisdiction over ConAgra because ConAgra conducts and transacts substantial business in Illinois. ConAgra has intentionally and purposefully marketed, promoted, distributed, and sold the Products at issue in Illinois, rendering exercise of jurisdiction by Illinois courts permissible.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## PARTIES

**Plaintiffs**

14.     Plaintiff John Bohen resides in Corona, California and is a citizen of California. Throughout the relevant period, Plaintiff John Bohen purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon ConAgra's "sustainable" representation. Specifically, Plaintiff Bohen purchased ConAgra Mrs. Paul's Crunchy Breaded Fillets and Van de Kamp's Fish Sticks from local Corona, California retailers such as Walmart once or twice a month since approximately 2020 until November 2022. Plaintiff Bohen specifically reviewed the "sustainable" labeling on the Products' packaging prior to purchase. In reasonable reliance on the Sustainability Promise, Plaintiff Bohen paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. ConAgra's Sustainability Promise was part of the basis of the bargain in that Plaintiff Bohen attributed value to ConAgra's Sustainability Promise and Plaintiff Bohen would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Sustainability Promise was untrue and/or misleading. Plaintiff Bohen paid a price premium for empty promises of sustainability that ConAgra did not keep. Had Plaintiff Bohen been aware that the "sustainable" representations made by ConAgra were untrue, he would not have paid more for the Products, or not purchased them at all.

15.     Plaintiff Abdallah Nasser resides in Woodbridge, Virginia and is a citizen of Virginia. Throughout the relevant period, Plaintiff Abdallah Nasser purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon ConAgra's "sustainable" representation. Specifically, Plaintiff Nasser purchased ConAgra Mrs. Paul's Crunchy Breaded Fillets and Van de Kamp's Crispy Battered Fillets from local Woodbridge, Virginia retailers such

as Walmart in December 2022. Plaintiff Nasser specifically reviewed the "sustainable" labeling on the Products' packaging. In reasonable reliance on the Sustainability Promise, Plaintiff Nasser paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. ConAgra's Sustainability Promise was part of the basis of the bargain in that Plaintiff Nasser attributed value to ConAgra's Sustainability Promise and Plaintiff Nasser would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Sustainability Promise was untrue and/or misleading. Plaintiff Nasser paid a price premium for empty promises of sustainability that ConAgra did not keep. Had Plaintiff Nasser been aware that the "sustainable" representations made by ConAgra were untrue, he would have paid less for the Products, or not purchased them at all.

**Defendant**

16.    Defendant ConAgra Brands Inc. ("ConAgra") is incorporated in Delaware and has its principal place of business in Chicago, Illinois. ConAgra produces, processes, markets, and distributes frozen Russian pollock products.

## FACTUAL BACKGROUND

I.    **ConAgra's Line of "Sustainable" Seafood Products**

17.    ConAgra markets, distributes, and sells its Products at various brick-and-mortar retail and grocery stores.

18.    All of ConAgra's Products uniformly tout the Sustainability Promise on the front of the product packaging where it cannot be missed by consumers. Examples of these representations on ConAgra's Products can be seen in the images below:

6

  

19.     Federal guidance and consumer research demonstrate that sustainability claims, like those proffered by ConAgra, suggest to reasonable consumers that the Products are sourced through sustainable methods and in accordance with fishing techniques that promote healthy ecosystems. MSC itself highlights maintenance of healthy fish populations and careful management of ecosystems as pillars of sustainable fishing practices.[3] As detailed in Section II, no reasonable consumer would consider fishing with a pelagic trawler to be "sustainable."

20.     The Federal Trade Commission's ("FTC") Green Guides ("Green Guides") were codified to "help marketers avoid making environmental marketing claims that are unfair or deceptive" based on its "views on how reasonable consumers likely interpret [those] claims."[4] The Green Guides are strong indicators of a reasonable consumer's understanding of sustainability practices.

21.     The FTC determined that "[u]nqualified general environmental benefit claims . . . likely convey that the product . . . has specific and far-reaching environmental benefits and may convey that the item . . . has no negative environmental impact."[5] For that reason, the FTC has

---

[3] What is the MSC?, https://www.msc.org/en-us/about-the-msc.

[4] FTC Green Guides, 16 C.F.R. § 260.1(a), (d) (2012).

[5] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, Federal Trade Commission (Apr. 2, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/04/ftc-sends-warning-letters-companies-regarding-diamond-ad-disclosures (last visited January 30, 2023); *see* also FTC Green Guides, 16 C.F.R. § 260.4(b) (2012).

cautioned against the use of claims, such as "sustainable," because "it is highly unlikely that [companies] can substantiate all reasonable interpretations of these claims."[6] In fact, the FTC has warned that "[m]arketers still are responsible for substantiating consumers' reasonable understanding of these claims."[7]

22.    Research demonstrates that claims related to sustainability are perceived by many consumers to mean "produced according to higher animal welfare standards."[8] Consumers have ranked "no pollution to the environment" and "respect to fish welfare" as two of the four most important elements of sustainable aquaculture.[9]

23.    Consumers associate the term "sustainable" with environment and atmosphere preservation (80%), animal welfare and protection (76%), environmental packaging (53%), and advocacy for human rights and ethical treatment of workers.[10]

24.    A study on consumer perception of the phrase "ecologically sustainable" found that a majority of consumers "expect eco-labelled seafood to be harvested in a way that reduced impact on the fish population or the marine environment."[11] And, out of 235 responses, only four percent

---

[6] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, *supra* n.5.

[7] FTC, The Green Guides, Statement of Basis and Purpose, pg. 258 (Oct. 1, 2012) https://bit.ly/2TQ7GL9 (last visited January 30, 2023).

[8] Katrin Zander *et al.*, *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe*, 30 J. Int'l Food & Agribusiness Marketing 251 (Dec. 22, 2017).

[9] *Id*.

[10] Krystle Morrison, *How Do Consumers Really Feel About Sustainability?*, Food Industry Executive (Jan. 25, 2022) https://foodindustryexecutive.com/2022/01/how-do-consumers-really-feel-about-sustainability/ (last visited January 30, 2023).

[11] Loren McClenachan *et al*., *Fair Trade Fish: Consumer Support for Broader Seafood Sustainability*, 17 FISH & FISHERIES 825 (Sept. 2016).

"expressed skepticism about the term ['ecologically sustainable']" and felt that "it was primarily a marketing term without real meaning."[12]

## II. ConAgra's False and Deceptive Advertising Suggests to Consumers that Its Products are Protective of Fish Stocks and Marine Life

25.     ConAgra, through the Sustainability Promise that appears on all its Products, has consistently conveyed to consumers that its sustainably sourced Products promote the protection of fish stocks, marine life, and human rights.

26.     ConAgra confirms its Sustainability Promise on its website, stating that the Products are from "well-managed, sustainable fisheries" and that "impacts on marine ecosystems are minimized."[13]

27.     In reality, ConAgra knew or should have known the Products are harvested using unsustainable fishing practices that harm fish populations and kill marine life, such as dolphins, whales, sea lions, seabirds, and sharks, some of which are endangered.

### A. ConAgra's Products are Harvested Using Commercial Fishing Practices that are Environmentally Destructive, Irresponsible, and Inhumane

28.     In purchasing ConAgra's Products with the Sustainability Promise, reasonable consumers expect that ConAgra would maintain the proper, company-wide monitoring to follow the explicit promises it makes regarding the alleged sustainable fishing practices used to source the Products. Failure to police MSC's blatant unsustainable practices violates the explicit Sustainability Promises ConAgra makes to consumers.

---

[12] *Id.*

[13] ConAgra Brands, *Mrs. Paul's: About Us*, https://www.mrspauls.com/about-us (last visited January 30, 2023); ConAgra Brands, *Van de Kamp's: About Us,* https://www.vandekamps.com/about-us (last visited January 30, 2023).

29.     ConAgra had an obligation to consumers to ensure that its prominent Sustainability Promise followed a reasonable consumer's expectation of sustainable seafood. Certainly, ConAgra knew it could not uphold that promise because it admits to using large scale fishing methods, including pelagic trawls employed by MSC fisheries, that indisputably harm the oceans and marine life.

30.     ConAgra's Products are harvested in the Bering Sea by Russian fisheries that use pelagic midwater trawls.[14] As described herein, no reasonable consumer would deem these fishing practices sustainable.

31.     A pelagic trawl is a large conical net with a horizontal opening that is towed through midwater depths. The net can be as wide as two football fields and as deep as 160 yards.

32.     A pelagic trawl is a non-selective method of catching fish. When a pelagic trawl is dragged through the water, all marine life within the net is captured, including marine mammals.[15] Most marine mammals swim at mid-water depths, which puts them at high risk of being captured

---

[14] Conagra Brands, *Citizenship Report 2021*; John Fiorillo, *US retail brands, fast food chains sourcing Russian fish find themselves in tightening vice*, Intrafish (March 1, 2022), https://www.intrafish.com/trade/us-retail-brands-fast-food-chains-sourcing-russian-fish-find-themselves-in-tightening-vice/2-1-1174986 (last visited January 30, 2023); Marine Stewardship Council, Track a Fishery, Pollock https://fisheries.msc.org/en/fisheries/@@search?q=pollock&term=&bucket=&__start__=fishery_name%3Asequence&fishery_name=fishery+shipowners+association+%28fsa%29+western+bering+sea+walleye+pollock&fishery_name=western+bering+sea+pollock&__end__=fishery_name%3Asequence&__start__=uoc_status%3Asequence&uoc_status=certified&__end__=uoc_status%3Asequence&__start__=species%3Asequence&species=walleye+pollock+-+gadus+chalcogrammus+%3D+theragra+chalcogramma&__end__=species%3Asequence&__start__=gear_type%3Asequence&__end__=gear_type%3Asequence&__start__=location%3Asequence&location=61+%28pacific%2C+northwest%29&__end__=location%3Asequence&__start__=certificate_number%3Asequence&__end__=certificate_number%3Asequence&filter=Update+Results#fndtn-results-tab (last visited January 30, 2023).

[15] NOAA, *Fishing Gear: Midwater Trawls*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-midwater-trawls (last visited January 30, 2023).

10

in these nets.[16] These non-target species are called bycatch and often drowned or are crushed by the weight of the other catch that has accumulated on top of them.

33.     Russian pollock fisheries do not have an effective measure in place to protect endangered species, such as Steller sea lions and albatross.[17]

34.     Steller sea lions, an endangered species that occupy the Bering Sea, are prone to getting caught in these nets because they prey upon pollock. From 2016 to 2020, documented Steller sea lion deaths were generally linked to pelagic trawl incidents, making up the majority of marine mammals entangled in discarded fishing gear.[18]

35.     Pollock trawl fisheries in the Bering Sea also frequently catch snow crab as bycatch, which they ultimately discard. Due to the use of pelagic trawls, these discarded crabs are estimated to have an 80% mortality rate.[19]

---

[16] *Id.*

[17] Ivan Stupachenko, *Russia nets two new MSC certifications for shrimp and pollock*, Seafood Source (Sept. 9, 2021), https://www.seafoodsource.com/news/environment-sustainability/russia-nets-two-new-msc-certifications-for-shrimp-and-pollock (last visited January 30, 2023).

[18] Yereth Rosen, *Steller sea lions most likely victims of human-caused marine mammal deaths in Alaska*, Alaska in Brief (Aug. 18, 2022), https://alaskabeacon.com/briefs/steller-sea-lions-most-likely-victims-of-human-caused-marine-mammal-deaths-in-alaska/ (last visited January 30, 2023).

[19] North Pacific Fishery Management Council, Crab Bycatch (2022), https://www.npfmc.org/fisheries-issues/bycatch/crab-bycatch/#:~:text=Bycatch%20of%20crab%20occurs%20both,as%20groundfish%20and%20scallop%20fisheries (last visited January 30, 2023).

36.     Although they are supposed to catch pollock in midwater, these pelagic trawls will scrape the bottom of the ocean at an 80% rate.[20] This constant contact with the seabed harms the benthic environment and crushes snow crabs that live in the path of the trawlers.[21]

37.     These unsustainable practices have contributed to the dramatic decline in the population of snow crabs in the Bering Sea over the past five years. During the recent 2022 season, the population collapsed, decreasing by the billions. Given the drastic impact of these practices, the snow crab harvest for 2022 was canceled.[22]

38.     No reasonable consumer would deem these fishing practices sustainable due to the severe harm they cause to snow crab populations, endangered marine mammals, seabirds, and marine ecosystems.

39.     Additionally, overfishing and bycatch have contributed to the depletion of species causing economic and environmental harm.

40.     Furthermore, ghost gear—known as abandoned, lost and discarded fishing gear—is the deadliest form of marine plastic.[23] "Unfortunately, wherever fishing takes place, gear is being

---

[20] Hal Bernton, *Into the ice: A crab boat's quest for snow crab in a Bering Sea upended by climate change*, Seattle Times (April 3, 2022), https://www.seattletimes.com/seattle-news/environment/into-the-ice-a-crab-boats-quest-for-snow-crab-in-a-bering-sea-upended-by-climate-change/ (last visited January 30, 2023).

[21] *Id.*

[22] https://www.livescience.com/billions-snow-crabs-vanish-from-bering-sea (last visited January 30, 2023).

[23] Emma Bryce, An invisible killer': how fishing gear became the deadliest marine plastic, The Guardian (Nov. 7, 2022); https://www.theguardian.com/environment/2022/nov/07/invisible-killer-ghost-fishing-gear-deadliest-marine-plastic.

lost,"[24] and MSC fisheries (which ConAgra employs) have not promulgated standards to prevent ghost gear.[25]

**B.** **Contrary to ConAgra's Sustainability Promise, the Labels on the Products Certified by the Marine Stewardship Council are False, Deceptive, and Misleading**

**1.** **MSC's Race to Profit**

41. Around the globe, consumers can find products certified by the MSC. These products are stamped with a Blue Tick that states they are "certified sustainable seafood."

42. The MSC is the world's largest (allegedly) sustainable seafood organization, and it markets itself as an industry leader with an aim to set sustainable fishing standards. The organization claims its mission is to use its ecolabel and its fishery certification program to recognize and reward sustainable fishing practices.

43. However, experts are concerned that the rapid growth of the MSC and the inherent conflict of interest involved with its operations have influenced the MSC to compromise its objective.

44. Jim Barnes, director of the Antarctic and Southern Ocean Coalition, worries the MSC is straying from its mission and needs an overhaul.[26]

---

[24] *Id.*

[25] https://www.msc.org/standards-and-certification/developing-our-standards/the-fisheries-standard-review/projects/prevention-of-gear-loss-and-ghost-fishing

[26] Daniel Zwerdling & Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?* NPR (Feb 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited January 30, 2023).

45. The MSC is, of course, out to make a profit. It charges retailers royalties starting at 0.5% of the net wholesale value of seafood sold for using its label.[27] Therefore, it naturally follows that the more fish and seafood that the MSC's customers sell, the more money the MSC earns.

46. The MSC has certified more than 30,000 seafood products globally.[28] Approximately 80% of the organization's income comes from licensing their logo on seafood products.[29] Fisheries that seek certification and the use of the MSC's "ecolabel" pay $20,000 to $100,000 USD.[30]

47. Chris Pincetich, a marine biologist with the Turtle Island Restoration Network, said, "The MSC has rushed to accept applications from hundreds of fisheries around the globe in order to grow their business and network. Many of those are actually viewed by scientists as unsustainable. They should really take a closer look before they even engage with those fisheries."[31]

48. Despite countless fisheries employing harmful practices that deplete fish populations, destroy habitats, and harm marine life, there have only been a handful that have ever been denied certification in over 20 years.[32]

---

[27] Marine Stewardship Council, *Apply to use the MSC label*, https://www.msc.org/for-business/use-the-blue-msc-label/apply (last visited January 30, 2023).

[28] Marine Stewardship Council, *Buy Sustainable Seafood*, https://www.msc.org/what-you-can-do/buy-sustainable-seafood (last visited January 30, 2023).

[29] *SEASPIRACY* (Ali Tabrizi dir., 2021).

[30] David Jolly, *Krill Harvest Certification Upsets Conservationists*, The New York Times, August 8, 2022, www.nytimes.com/2010/06/23/science/earth/23krill.html (last visited January 30, 2023).

[31] Richa Syal, *License to krill: the destructive demand for a 'better' fish oil*, The Guardian (Sept. 7, 2021), https://www.theguardian.com/environment/2021/sep/07/license-to-krill-the-destructive-demand-for-a-better-fish-oil (last visited January 30, 2023)

[32] *SEASPIRACY* (Ali Tabrizi dir., 2021).

49. Professor Callum Roberts, a marine biologist in the Department of Environment and Geography, University of York, and Amy Hammond, Head of Research at Seahorse Environmental Communications, express the perception that "the bar has been dropped unacceptably low in order to satisfy ever-growing market demand by getting more (generally large industrial) fisheries into the program."[33]

## 2. MSC's Fishery Standards

50. The MSC defines sustainable seafood as seafood that comes from fisheries that catch fish in ways that ensure the long-term health of a stock or species and the wellbeing of the ocean.[34] Individual fishers or vessels cannot be MSC certified—only fishing operations.[35] According to the MSC's website, there are currently more than 400 wild capture fisheries certified to this standard.[36]

51. MSC's Fishery Standards require:

- "Fishing must be at a level that ensures it can continue indefinitely and the fish population can remain productive and healthy."

- "Fishing activity must be managed carefully so that other species and habitats within the ecosystem remain healthy."

- "[F]isheries must comply with relevant laws and be able to adapt to changing environmental circumstances."

---

[33] Amy Hammond & Callum Roberts, *Why The Marine Stewardship Council Needs an Independent Review*, ETHICAL CONSUMER (July 31, 2019.) https://www.ethicalconsumer.org/food-drink/why-marine-stewardship-council-needs-independent-review (last visited January 30, 2023).

[34] Marine Stewardship Council, What does the blue MSC label mean? www.msc.org/what-we-are-doing/our-approach/what-does-the-blue-msc-label-mean (last visited January 30, 2023).

[35] *Id*.

[36] *Id*.

### 3.    MSC Violates Its Own Fishery Standards

52.    ConAgra knows or should know that the MSC violates its fishery standards because it certifies fisheries that do not consider long term health of fish populations, do not consider the health of other species, and do not consider the protection of ecosystems. Furthermore, the MSC does not take changing environmental circumstances into account.

53.    The MSC certifies large scale fisheries—most of which use harmful fishing techniques, such as purse seiners and trawlers—that account for 93% of MSC's certified catch; the remaining 7% of catch comes from small fisheries.[37] The fishing methods used by these fisheries cause overfishing and indiscriminately capture non-target species.

54.    Gerry Leape, an Ocean Specialist at the Pew Environment Group, supported MSC for more than a decade as a member of its advisory Stakeholder Council, but he and other critics say that the MSC has been certifying fisheries despite evidence that the target fish are in trouble, or that the fishing industry is harming the environment.[38]

55.    The MSC recently certified a Russian pollock fishery notwithstanding its refusal to cooperate with certain conditions, including efforts to minimize lethal impacts of the fishery on

---

[37] Frederic Le Manach *et al.*, *Small is beautiful, but large is certified: A comparison between fisheries the Marine Stewardship Council (MSC) features in its promotional materials and MS+C-certified fisheries,* (May 4, 2020); Marine Stewardship Council, *Fishing Methods and Gear Types*, https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types (last visited January 30, 2023).

[38] Daniel Zwerdling and Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?*, NPR (Feb. 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited January 30, 2023).

endangered species, providing data on the impacts to endangered species, and minimizing impacts on habitats.[39]

56. MSC-certified Russian fisheries in the Bering Sea lack scientific observer coverage and a comprehensive strategy to ensure endangered species, such as the Steller sea lion and albatross, are being protected.[40]

57. MSC failed to consider the impact that Russian fisheries' harmful pelagic trawl practices, compounded with climate change, have had on the environment and how these practices have contributed to the decimation of the snow crab population in the Bering Sea.

58. Moreover, MSC has certified Russian pollock fisheries using pelagic trawls that have failed to maintain healthy fish populations and have caught excessive amounts of juvenile pollock as bycatch.[41]

59. Bycatch levels are ignored by the MSC because, according to the organization itself, the levels are arbitrarily considered "sustainable."[42]

60. MSC purports to have observers on board that monitor bycatch. However, there is evidence that observers' reports about bycatch, shark finning, and observer bribery are being ignored on MSC-certified vessels.[43] Such evidence includes images of shark finning and the

---

[39] Ivan Stupachenko, *Russia nets two new MSC certifications for shrimp and pollock*, Seafood Source (Sept. 9, 2021), https://www.seafoodsource.com/news/environment-sustainability/russia-nets-two-new-msc-certifications-for-shrimp-and-pollock (last visited January 30, 2023).

[40] MSC Fisheries Assessments, Fishery Shipowners Association (FSA) Western Bering Sea Walleye Pollock (May 31, 2022); MSC Fisheries Assessments, Western Bering Sea Pollock Public Certification Report (July 2021).

[41] https://www.mcsuk.org/goodfishguide/ratings/wild-capture/29/ (last visited January 30, 2023).

[42] *SEASPIRACY* (Ali Tabrizi dir., 2021).

[43] J Schwenzfeier *et al.*, *Slipping Through the Net, Reported but Ignored: Infringements in the MSC tuna fisheries of the Western and Central Pacific.*, Shark Guardian (May 2022).

capturing of whale sharks, giant rays, and other species of concern on MSC boats.[44] More graphically, fishers have left marine animals to die on the decks or butchered them in the nets while they were still alive.[45]

61.     Abandoned, lost, or discarded fishing gear, also known as "ghost gear" is the deadliest form of plastic in the ocean and it greatly impacts marine life populations, including whales, dolphins, sharks, and sea turtles.[46] However, MSC does not require the fisheries it certifies to provide effective strategies for mitigating ghost gear.

### 4.     Expert Criticism of MSC Fishing Standards

62.     Globally, researchers, academics, and scientists have criticized the MSC for disregarding its own standards and compromising its credibility.

63.     Richard Page, a Greenpeace Oceans Campaigner, said decisions to certify some fisheries "seriously undermine" the MSC's credibility. "I will go as far as to say consumers are being duped. They think they are buying fish that are sustainable and can eat them with a clean conscience."[47]

64.     Rory Crawford, the MSC's own advisory council and a member of Bird Life International, conducted a study of 23 fisheries in 2019 and found that only three were actively

---

[44] *Id.*

[45] *Id.*

[46] Ingrid Giskes, *Ghost Gear Prevention in the Seafood Industry*, Ocean Conservancy (Feb. 2, 2021),     https://oceanconservancy.org/blog/2021/02/02/ghost-gear-prevention-seafood-industry/ (last visited January 30, 2023).

[47] Richa Syal, *License to krill: the destructive demand for a 'better' fish oil*, The Guardian (Sept. 7, 2021), https://www.theguardian.com/environment/2021/sep/07/license-to-krill-the-destructive-demand-for-a-better-fish-oil (last visited January 30, 2023).

working to monitor and minimize bycatch. "Consumers cannot be fully confident that certified fish comes without impacts on non-target species, from sharks to seabirds to whales."[48]

65. Gerry Leape, an Ocean Specialist at the Pew Environment Group, supported the MSC for more than a decade as a member of its advisory Stakeholder Council, but is now concerned, stating, "We would prefer they didn't use the word *sustainable*." He and other critics say that the MSC system has been certifying fisheries despite evidence that the fish stocks are in trouble or that the fishing is harming the environment.[49]

66. Daniel Paulie, a fisheries professor at the University of British Columbia, helped create the MSC, but now feels it is doing business for the industry, not the environment.[50] He has called for a complete ban of open-ocean fishing because it is essential to rebuilding globally depleted fish stocks and preventing the demise of the fishing industry.[51]

### 5. The MSC's Certification Label is Present on the Packaging of ConAgra's Products

67. Despite the clear violations of sustainable fishing practices detailed herein, ConAgra promotes its Mrs. Paul's and Van de Kamp's frozen pollock by prominently placing a Sustainability Promise on its Products. With consumers willing to pay a price premium for sustainable seafood products, ConAgra receives great financial benefit when it sells Products

---

[48] Karen Mc Veigh, *Blue ticked off: the controversy over the MSC fish 'ecolabel'*, The Guardian (July 26, 2021), https://www.theguardian.com/environment/2021/jul/26/blue-ticked-off-the-controversy-over-the-msc-fish-ecolabel (last visited January 30, 2023).

[49] Daniel Zwerdling & Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?* NPR (Feb 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited January 30, 2023).

[50] *Id.*

[51] Richard Schiffman, *A Global Ban on Fishing on the High Seas? The Time Is Now*, Yale Environment 360 (Sept. 27, 2018), https://e360.yale.edu/features/a-global-ban-on-fishing-on-the-high-seas-the-time-is-now#:~:text=the%20High%20Seas%3F-,The%20Time%20Is%20Now,of%20the%20fishing%20industry%20itself (last visited January 30, 2023).

touted as "certified sustainable seafood" and bearing the MSC label. However, no reasonable consumer would consider such Products "certified sustainable seafood" if they knew that the seafood in question was obtained using the fishing practices detailed herein, or that the fishing practices employed to obtain such seafood were in violation of the certifier's own standards.

68. ConAgra Products are obtained using methods that fail to contribute to the health of non-target species in marine ecosystems. The pelagic trawl fishing technique indiscriminately catches and injures or kills excessive amounts of marine mammals, sea birds, and snow crabs.

69. ConAgra's Products come from fisheries that are not harvesting fish in ways that provide long-term healthy fish stocks. Instead, these fisheries contribute to overfishing and, given the acute impact they have on marine ecosystems, are cause for concern.

### III. ConAgra's Sustainability Promise is Material to Consumers

70. The FTC has specifically acknowledged that "sustainable" claims are material to consumers.[52]

71. Moreover, in 2013, the FTC submitted a comment outlining factors that the MSC should consider to ensure that its "certified sustainable seafood" label complies with the FTC Act and the agency's Green Guides. The comment particularly emphasized that the MSC's standards be grounded in sound science and that the organization, or any other third-party certifier, should consider consumer protection when developing or reviewing a certification system. Quoting the FTC's comment specifically, the agency advised, "If a certifier permitted practices that reasonable consumers found inconsistent with their interpretation of the seal, the certifier should change the seal or change the certification process to comport with that understanding. Therefore, the MSC …

---

[52] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, *supra* n.5.

should take into account how reasonable consumers will perceive the MSC seal at the retail level."[53]

72.     Researchers have found that consumers seek out and are willing to pay significantly more for products labeled as "ecologically sustainable."[54]

73.     This finding is consistent with research that has found that "consumers are willing to pay to improve animal welfare and reduce undesirable environmental effects" from fishing."[55]

## IV.     Impact of ConAgra's Wrongful Conduct

74.     ConAgra's Sustainability Promise deceives and/or is likely to deceive the public. Reasonable consumers have been, and continue to be, deceived into believing that ConAgra's Products are harvested using sustainable fishing practices. Moreover, reasonable consumers have been, and continue to be, deceived into believing that ConAgra's Products are harvested in compliance with the MSC's Fishery Standards and other requirements.

75.     Consumers are unable to discover the true nature of ConAgra's Products from the Product's packaging. Ordinary consumers do not have sufficient knowledge about the commercial fishing industry to know or ascertain that ConAgra's Products are sourced using unsustainable practices that effectively destroy marine ecosystems and deplete fish stocks. Likewise, ordinary consumers do not have sufficient knowledge about ConAgra's practices to know or ascertain whether ConAgra is actually complying with the MSC's Fishery Standards and other requirements.

---

[53] Donald S. Clark, *Marine Stewardship Council's Fishery Standards Review*, Federal Trade Commission, (May 2013).

[54] McClenachan *et al.*, *supra* n.11.

[55] Ingrid Olesen *et al.*, *Eliciting Consumers' Willingness to Pay for Organic and Welfare-Labelled Salmon in a Non-Hypothetical Choice Experiment*, 127 Livestock Sci. 218 (Feb. 2010), https://pubag.nal.usda.gov/catalog/775401 (last visited January 30, 2023).

76.     ConAgra knew or should have known that their Products are not sourced sustainably. In making false, deceptive, and misleading representations, ConAgra intended to deceive reasonable consumers into buying and/or paying more for products marketed with a Sustainability Promise.

77.     ConAgra's material misrepresentations and omissions set forth in this Complaint were disseminated uniformly to Plaintiffs and all Class Members through product packaging and labeling, exposing Plaintiffs and all Class Members to ConAgra's false, deceptive, and misleading advertising and unfair, unlawful, and fraudulent business practices.

78.     When purchasing ConAgra's Products, Plaintiffs relied upon ConAgra's misrepresentations and omissions. Had ConAgra not made a Sustainability Promise that was false, deceptive, and misleading, reasonable consumers would not have been willing to pay a price premium for the Products or would not have purchased the Products at all.

79.     Plaintiffs were injured at the time of purchase as they would not have paid a premium price or purchased ConAgra's Products had ConAgra made truthful advertising statements and disclosed material information concerning the fishing practices involved with its Products, including its failure to comply with MSC standards and the supported use of its Blue Tick.

80.     ConAgra's material misrepresentations and omissions set forth in this Complaint induced Plaintiffs into purchasing ConAgra's Products, resulting in remittance from Plaintiff to the benefit of ConAgra. Had ConAgra advertised its Products truthfully, Plaintiffs would not have paid ConAgra for its Products.

81.     Plaintiffs and Class Members have been, and will continue to be, deceived or misled by ConAgra's false and misleading misrepresentations and omissions concerning the fishing practices used to source its Products.

82.     Plaintiffs and Class Members are reasonable consumers who have been injured by purchasing ConAgra's Products. Because of ConAgra's material misrepresentations and omissions in its statements and advertisements concerning its Products, including on product packaging and labeling, Plaintiffs and Class Members were harmed at the time of purchase.

83.     ConAgra's misrepresentations and omissions were a material factor in influencing Plaintiffs' and Class Members' decision to purchase ConAgra's Products.

84.     ConAgra's conduct has injured Plaintiffs and Class Members because ConAgra's Products are not sustainably sourced, and do not even comply with the MSC's own standards. Rather, ConAgra's fishing practices are known to be destructive, and ConAgra failed to conspicuously disclose this reality to Plaintiffs and Class Members.

85.     ConAgra continues to engage in the unlawful acts and practices set forth in this Complaint.

86.     Unless enjoined, ConAgra's unlawful acts and practices described in this Complaint will continue.

## CLASS ACTION ALLEGATIONS

87.     Plaintiffs bring this matter on behalf of themselves and those similarly situated. As detailed at length in this Complaint, ConAgra orchestrated deceptive marketing, advertisement, and labeling practices. ConAgra's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

88.     Plaintiffs Bohen and Nasser bring this action as a class action pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 23 on behalf of themselves and all others similarly situated as members. The Nationwide Class is defined as:

> **All persons who purchased in the United States any of the Products, within the applicable statute of limitations, during the Class Period.**

89.     Plaintiffs Bohen and Nasser bring this action as a class action individually and all others similarly situated. The Multi-State Consumer Protection Class is defined as:

> **All persons who purchased in the State of Illinois or any state with similar laws[56] any of the Products, within the applicable statute of limitations, during the Class Period.**

---

[56] Plaintiffs assert that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Arkansas (Ark. Code §§ 4-88-101, *et seq.*); Colorado (Colo. Rev. Stat. §§ 6-1-101, *et seq.*); Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq.*); Delaware (Del. Code tit. 6, §§ 2511, *et seq.*); District of Columbia (D.C. Code §§ 28-3901, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq.*); Idaho (Idaho Code §§ 48-601, *et seq.*); Illinois (815 ICLS §§ 505/1, *et seq.*); Maine (Me. Rev. Stat. tit. 5 §§ 205-A, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); Montana (Mo. Code. §§ 30-14-101, *et seq.*); Nebraska (Neb. Rev. Stat. §§ 59 1601, *et seq.*); Nevada (Nev. Rev. Stat. §§ 598.0915, *et seq,*); New Hampshire (N.H. Rev. Stat. §§ 358-A:1, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New Mexico (N.M. Stat. §§ 57-12-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); North Dakota (N.D. Cent. Code §§ 51-15-01, *et seq.*); Oklahoma (Okla. Stat. tit. 15, §§ 751, *et seq.*); Oregon (Or. Rev. Stat. §§ 646.605, *et seq.*); Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*); South Dakota (S.D. Code Laws §§ 37-24-1, *et seq.*); Texas (Tex. Bus. & Com. Code §§ 17.41, *et seq.*); Virginia (VA Code §§ 59.1-196, *et seq.*); Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq.*); Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*); West Virginia (W. Va. Code §§ 46A-6- 101, *et seq.*); and Wisconsin (Wis. Stat. §§ 100.18, *et seq.*). *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

90.     Plaintiffs Bohen and Nasser also seek certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of Illinois at any time during the Class Period (the "Illinois Subclass") as follows:

**All persons who purchased in the State of Illinois any of the Products, within the applicable statute of limitations, during the Class Period.**

91.     Plaintiff Bohen also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of California at any time during the Class Period (the "California Subclass") as follows:

**All persons who purchased in the State of California any of the Products, within the applicable statute of limitations, during the Class Period.**

92.     Plaintiff Nasser also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of Virginia at any time during the Class Period (the "Virginia Subclass") as follows:

**All persons who purchased in the State of Virginia any of the Products, within the applicable statute of limitations, during the Class Period.**

93.     The Nationwide Class, Multi-State Consumer Protection Class, and Illinois, California, and Virginia Subclasses are referred to collectively throughout the Complaint as the Class, and the members of the Classes are referred to as the "Class Members." Specifically excluded from the Classes are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the class definitions as necessary.

94. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

95. **Numerosity**: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers who are Class Members that have been damaged by ConAgra's deceptive and misleading practices.

96. **Commonality**: The questions of law and fact common to the Class Members, which predominate over any questions that may affect individual Class Members include, but are not limited to:

(a) Whether ConAgra is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

(b) Whether ConAgra's misconduct set forth in this Complaint demonstrates that ConAgra has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

(c) Whether ConAgra made false and/or misleading statements to the Class and the public concerning the contents of its Products;

(d) Whether ConAgra's false and misleading statements concerning its Products were likely to deceive the public; and

(e) Whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

97. **Typicality**: Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same

deceptive, misleading conduct and purchased ConAgra's Products. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

98.     **Adequacy**: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent; their consumer fraud claims are common to all members of the Class and they have a strong interest in vindicating their rights; they have retained counsel that is competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.

99.     **Predominance**: Pursuant to rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on ConAgra's deceptive and misleading marketing and labeling practices.

100.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

(a)     The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

(b)     The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

(c)     When ConAgra's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far

27

less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

(d)     This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

(e)     Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

(f)     This class action will assure uniformity of decisions among Class Members;

(g)     The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

(h)     Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

(i)     It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by ConAgra's uniform false marketing and advertising to purchase its Products as being good for the planet and eco-friendly.

101.     Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

**COUNT ONE**
**VIOLATION OF THE ILLINOIS**
**CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiffs on Behalf of the Illinois Subclass)**

102.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

103.    Plaintiffs bring this action individually and on behalf of the Illinois Subclass.

104.    In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

105.    Plaintiffs and the Illinois Subclass Members were injured by ConAgra's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiffs and the Class. Because Plaintiffs Bohen and Nasser and the Illinois Subclass Members relied on ConAgra's misrepresentations, concealments and omissions when purchasing ConAgra's Products, they were injured at the time of purchase.

106.    ConAgra does business in Illinois, sell and distribute their Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

107.    The Products purchased by Plaintiffs Bohen and Nasser and the Illinois Subclass Members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

108.    ConAgra engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when they misrepresented and deceptively concealed, suppressed and/or omitted the material information known to ConAgra as set forth above concerning their Products, which has caused damage and injury to Plaintiffs Bohen and Nasser and the Illinois Subclass Members. Plaintiffs Bohen and Nasser and the Illinois Subclass Members were injured by ConAgra's unfair and deceptive acts at the time of purchasing ConAgra's Products.

109.    ConAgra represented, directly or indirectly, that their Products were "sustainable" when, in reality, they are not.

110.    ConAgra failed to disclose in their advertising statements the material fact that despite the uniform "sustainable" representations on the packaging of the Products, that they were, in fact, not "sustainable."

111.    ConAgra knew or should have known that their "sustainable" representations were false and misleading, and that by omitting and failing to disclose the truth in their advertising, they were omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

112.    ConAgra's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

113.    ConAgra intended Plaintiffs Bohen and Nasser and the Illinois Subclass Members to rely on their deceptive acts when purchasing ConAgra's Products.

114.    ConAgra's deceptive acts proximately caused actual injury and damage to Plaintiffs Bohen and Nasser and the Illinois Subclass Members at the time of purchase.

115.    Plaintiffs Bohen and Nasser and the Illinois Subclass Members would not have purchased, or would have paid less for, ConAgra's Products but for ConAgra's material misrepresentations as described in this Complaint.

**COUNT TWO**
**VIOLATION OF THE ILLINOIS**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiffs on Behalf of the Illinois Subclass)**

116.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

117.    Plaintiffs bring this action individually and on behalf of the Illinois Subclass.

118.    The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

119.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

120.    ConAgra engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to ConAgra as set forth above concerning its Products, which have caused damage and injury to Plaintiffs Bohen and Nasser and the Illinois Subclass Members. Plaintiffs

Bohen and Nasser and the Illinois Subclass Members were injured by ConAgra's unfair and deceptive conduct at the time of purchasing ConAgra's Products.

121.    ConAgra represented, directly or indirectly, that its Products were "sustainable," when, in reality, they are not.

122.    ConAgra failed to disclose in its advertising statements the material fact that the Products are not "sustainable.".

123.    ConAgra knew or should have known that its "sustainable" representations were false and misleading, and that by omitting and failing to disclose the truth in its advertising, they were was omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

124.    ConAgra's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

125.    ConAgra's deceptive acts proximately caused actual injury and damage to Plaintiffs Bohen and Nasser and the Illinois Subclass Members at the time of purchase.

126.    Plaintiffs Bohen and Nasser and the Illinois Subclass Members would not have purchased, or would have paid less for, ConAgra's Products but for ConAgra's material misrepresentations as described in this Complaint.

127.    ConAgra intended Plaintiffs Bohen and Nasser and the Illinois Subclass Members to rely on its deceptive acts when purchasing the Products.

**COUNT THREE**
**VIOLATION OF THE CALIFORNIA**
**CONSUMERS LEGAL REMEDIES ACT**
**("CLRA"), Civil Code §§ 1750, *et seq.***
**(By Plaintiff Bohen on Behalf of the California Subclass)**

128.    Plaintiff Bohen incorporates the preceding paragraphs as if fully set forth herein.

129.     Plaintiff Bohen brings this action individually and on behalf of the California Subclass.

130.     The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

131.     The CLRA applies to all claims of all California Subclass Members because the conduct which constitutes violations of the CLRA by ConAgra occurred within the State of California.

132.     Plaintiff Bohen and California Subclass Members are "consumers" as defined by Civil Code § 1761(d).

133.     ConAgra is a "person" as defined by Civil Code § 1761(c).

134.     The Products qualify as "goods" as defined by Civil Code § 1761(a).

135.     Plaintiff Bohen and California Subclass Members' purchases of the Products are "transactions" as defined by Civil Code § 1761(e).

136.     As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

- "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

- "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

- "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

- "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

137. ConAgra engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Products had benefits or characteristics (that they were "sustainable") that they did not actually have.

138. As detailed in the body of this Complaint, ConAgra has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding Products benefits or characteristics that they did not in fact have, and represented the Products to be of a quality that was not true. Indeed, ConAgra concealed this information from Plaintiff Bohen and California Subclass Members.

139. ConAgra represented, directly or indirectly, that their Products were "sustainable" when, in reality, they are not.

140. ConAgra failed to disclose in their advertising statements the material fact that despite the uniform "sustainable" representations on the packaging of the Products, that they were, in fact, not "sustainable."

141. ConAgra knew or should have known that their "sustainable" representations were false and misleading, and that by omitting and failing to disclose the truth in their advertising, they were omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

142. ConAgra's deceptive acts occurred in a course of conduct involving trade and commerce in California and throughout the United States.

143. ConAgra intended Plaintiff Bohen and California Subclass Members to rely on their deceptive acts when purchasing ConAgra's Products.

144.    ConAgra's deceptive acts proximately caused actual injury and damage to Plaintiff Bohen and California Subclass Members at the time of purchase.

145.    Plaintiff Bohen and California Subclass Members would not have purchased, or would have paid less for, ConAgra's Products but for ConAgra's material misrepresentations as described in this Complaint.

146.    ConAgra engaged in uniform marketing efforts to reach California Subclass Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase the Products. ConAgra's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the "sustainability" of the Products.

147.    Despite these misrepresentations, ConAgra also omitted and concealed information and material facts from Plaintiff Bohen and California Subclass Members.

148.    In their purchase of Products, Plaintiff Bohen and California Subclass Members relied on ConAgra's representations and omissions of material facts.

149.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

150.    Pursuant to Cal. Civ. Code § 1782, Plaintiff Bohen notified ConAgra in writing by certified mail sent on March 2, 2023, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above and give notice to all affected consumer of ConAgra's intent to do so. If ConAgra does not agree to rectify the problems identified and give notice to all affected consumers within 30 days of the date of written notice, Plaintiffs will amend this Complaint to seek actual, punitive and statutory damages, as appropriate.

151. A declaration establishing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(d) is attached hereto as Exhibit A.

152. In accordance with Civil Code § 1780(a), Plaintiff Bohen and California Subclass Members seek injunctive and equitable relief for ConAgra's violations of the CLRA, including an injunction to enjoin ConAgra from continuing its deceptive advertising and sales practices.

**COUNT FOUR**
**VIOLATION OF THE CALIFORNIA**
**UNFAIR COMPETITION LAW**
**("UCL"), California Business and Professions Code §§ 17200,** *et seq.*
**(Plaintiff Bohen on Behalf of the California Subclass)**

153. Plaintiff Bohen incorporates the preceding paragraphs as if fully set forth herein.

154. Plaintiff Bohen brings this action individually and on behalf of the California Subclass.

155. ConAgra is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

156. ConAgra has engaged in unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq.* because ConAgra's conduct is misleading, unfair, and illegal as herein alleged. Plaintiff Bohen and California Subclass Members were injured by ConAgra's conduct because they would not have purchased the Products and/or paid as much as they did had they known ConAgra materially misrepresented the Products and/or omitted material information regarding its Products.

157. ConAgra's business practices, and each of them, are unfair because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are led to believe that the Products are "sustainable" when they are not.

158.    ConAgra's business practices are unlawful because the conduct is in violation of the CLRA and the California Business and Professions Code §§ 17500, *et seq.*, false marketing and advertising, as well as the other causes of action herein alleged.

159.    The practices are misleading because they were likely to deceive consumers into believing that the Products are "sustainable" when they are not.

160.    Plaintiff Bohen and California Subclass Members who purchased ConAgra's Products suffered an injury by virtue of buying products in which ConAgra misrepresented and/or omitted the Products' true quality, reliability, safety, and use. Had Plaintiff Bohen and California Subclass Members known that ConAgra materially misrepresented the Products and/or omitted material information regarding its Products, they would not have purchased the Products.

161.    ConAgra's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this Complaint. There is no benefit to consumers or competition by allowing ConAgra to deceptively label, market, and advertise its Products.

162.    Plaintiff Bohen and California Subclass Members who purchased ConAgra's Products had no way of reasonably knowing that the Products were deceptively packaged, marketed, advertised, and labeled. Thus, Plaintiff Bohen and California Subclass Members could not have reasonably avoided the harm they suffered.

163.    The gravity of the harm suffered by Plaintiff Bohen and California Subclass Members who purchased ConAgra's Products outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Products in a deceptive and misleading manner.

164.    The above acts of ConAgra in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Bohen and California Subclass Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of ConAgra's Products, and thus were violations of Civil Code §§ 1750, *et seq.* and Cal. Bus. & Prof. Code §§ 17500, *et seq.*

165.    As a result of ConAgra's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seek injunctive relief prohibiting ConAgra from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and restitutionary disgorgement of ill-gotten profits derived from ConAgra's wrongful conduct to the fullest extent permitted by law.

**COUNT FIVE**
**VIOLATION OF THE CALIFORNIA**
**FALSE ADVERTISING LAW**
**California Business and Professions Code §§ 17500, *et seq.***
**(By Plaintiff Bohen on Behalf of the California Subclass)**

166.    Plaintiff Bohen incorporates the preceding paragraphs as if fully set forth herein.

167.    Plaintiff Bohen brings this action individually and on behalf of the California Subclass.

168.    The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

169.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and

38

which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

170.    Specifically, ConAgra marketed, labeled, and represented the Products as "sustainable," when in fact they are not.

171.    ConAgra's failure to ensure that the Sustainability Promise was, in fact, truthful is a violation of the explicit promises that it made to consumers on each and every Product label. Consumers expected that ConAgra would have the proper, company-wide monitoring in place to confirm the explicit promise it made to consumers regarding the sustainability of the fishing practices used to source the Products. Instead, ConAgra failed to ensure that the fisheries only sourced using sustainable means, making its promises meaningless.

172.    ConAgra was either aware that Products were not caught using sustainable fishing practices consistent with the Blue Tick labeling or should have known that it lacked the information and/or knowledge required to make such a representation truthfully. ConAgra concealed and omitted and failed to disclose this information to Plaintiff Bohen and California Subclass Members.

173.    ConAgra's descriptions of the Products were false, misleading, and likely to deceive Plaintiff Bohen and California Subclass Members and other reasonable consumers.

174.    ConAgra's conduct therefore constitutes deceptive or misleading advertising.

175.    Plaintiffs have standing to pursue claims under the FAL as they reviewed and relied on ConAgra's packaging, advertising, representations, and marketing materials regarding the Products when selecting and purchasing the Products.

176.    In reliance on the statements made in ConAgra's advertising and marketing materials and ConAgra's omissions and concealment of material facts regarding the sustainability of the Products, Plaintiff Bohen and California Subclass Members purchased the Products.

177.    Had ConAgra disclosed the true nature of the Products (that they were not sustainable), Plaintiff Bohen and California Subclass Members would not have purchased Products or would have paid substantially less for them.

178.    As a direct and proximate result of ConAgra's actions, as set forth herein, ConAgra has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Bohen and California Subclass Members who paid for the Products, which were not sustainable.

179.    Plaintiff Bohen and California Subclass Members seek injunctive relief, restitution, and restitutionary disgorgement of any monies wrongfully acquired or retained by ConAgra and by means of its deceptive or misleading representations, including monies already obtained from Plaintiff Bohen and California Subclass Members as provided for by the California Business and Professions Code § 17500.

**COUNT SIX**
**VIOLATION OF THE VIRGINIA**
**CONSUMER PROTECTION ACT OF 1977**
**(By Plaintiff Nasser on Behalf of the Virginia Subclass)**

180.    Plaintiff Nasser incorporates the preceding paragraphs as if fully set forth herein.

181.    Plaintiff Nasser brings this action individually and on behalf of the Virginia Subclass.

182.    Plaintiff Nasser brings this claim on behalf of the Virginia Subclass against ConAgra for violation of the Virginia Consumer Protection Act of 1977, Va. Code Ann. §§ 59.1-196, *et seq*.

183.    ConAgra is a "supplier," as defined by Virginia Code section 59.1-198.

184.     ConAgra engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods," as defined by Virginia Code section 59.1-198. ConAgra advertised, offered, or sold goods used primarily for personal, family or household purposes.

185.     Under the Virginia Consumer Protection Act of 1977:

The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

. . .

5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

. . .

8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.

. . . [and]

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction . . . .

Va. Code Ann. § 59.1-200(A)(5), (6), (8), (14).

186.     ConAgra engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation, including, but not limited to, representing and labeling the Products as "sustainable," as described herein, in violation of each of the provisions set forth in the preceding paragraph.

187.     ConAgra's representations and omissions were material because they were likely to deceive reasonable consumers.

188.     ConAgra made the misrepresentations because consumers purchased the particular Products given the representations made about the sustainability of the Products. But ConAgra made these representations without any mechanism in place—or intention to develop such

mechanism—to ensure that those practices were being followed as described to Plaintiff Nasser and the Virginia Subclass.

189.    As a direct and proximate result of ConAgra's deceptive acts and practices, Plaintiff Nasser and the Virginia Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

190.    ConAgra's violations present a continuing risk of injury to Plaintiff Nasser and the Virginia Subclass, as well as to the general public.

191.    Plaintiff Nasser and the Virginia Subclass seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

192.    Therefore, Plaintiffs pray for relief as set forth below.

## COUNT SEVEN
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (By Plaintiffs Bohen and Nasser on Behalf of the Multi-State Consumer Class)

193.    Plaintiffs Bohen and Nasser incorporate the preceding paragraphs as if fully set forth herein.

194.    Plaintiffs Bohen and Nasser bring this action individually and on behalf of the Multi-State Consumer Class.

195.    Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members have been injured as a result of ConAgra's violations of the state consumer protection statutes listed above in paragraph 90 and footnote 56, which also provide a basis for redress to Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members based on ConAgra's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

196.    ConAgra's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

197.    ConAgra violated the Multi-State Consumer Class states' unfair and deceptive acts and practices laws by representing that its Products are "sustainable," when, in reality, they are not.

198.    ConAgra's misrepresentations were material to Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members' decision to purchase the Products or pay a premium for the Products.

199.    ConAgra made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

200.    As a result of ConAgra's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members paid a premium for the Products.

201.    As a result of ConAgra's violations, ConAgra has been unjustly enriched.

202.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT EIGHT**
**UNJUST ENRICHMENT/QUASI-CONTRACT**
**(By Plaintiffs Bohen and Nasser on Behalf of the Nationwide Class, or in the Alternative, on Behalf of the California, Virginia, and Illinois Subclasses, Respectively)**

203.    Plaintiffs Bohen and Nasser incorporate the preceding paragraphs as if fully set forth herein.

204.    Plaintiffs Bohen and Nasser bring this action individually and on behalf of the Nationwide Class, or in the alternative, on behalf of the California, Virginia, and Illinois Subclasses, respectively.

205.    ConAgra's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint. ConAgra's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm. While Plaintiffs Bohen and Nasser and Nationwide Class Members were harmed at the time of purchase, ConAgra was unjustly enriched by their misrepresentations and omissions.

206.    Plaintiffs Bohen and Nasser and Nationwide Class Members were harmed when purchasing ConAgra's Products as a result of ConAgra's material representations and omissions, as described in this Complaint. Each Plaintiffs Bohen and Nasser and Nationwide Class Members purchased ConAgra's Products. Plaintiffs Bohen and Nasser and Nationwide Class Members have suffered injury in fact and lost money as a result of paying a premium price for the Products and by purchasing the Products at all, and as a result of ConAgra's unlawful, unfair, and fraudulent business practices.

207.    ConAgra's conduct allows ConAgra to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment of, Plaintiffs Bohen and Nasser

44

and Nationwide Class Members, and to ConAgra's benefit and enrichment. ConAgra's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

208.    Plaintiffs Bohen and Nasser and Nationwide Class Members confer significant financial benefits and pay substantial compensation to ConAgra for their Products, which are not as ConAgra represent them to be.

209.    Under common law principles of unjust enrichment and quasi-contract, it is inequitable for ConAgra to retain the benefits conferred by Plaintiffs Bohen's and Nasser's and Nationwide Class Members' overpayments.

210.    Plaintiffs Bohen and Nasser and Nationwide Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs Bohen and Nasser and Nationwide Class Members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Bohen and Nasser, on behalf of themselves and the Class, pray for judgment as follows:

1.    Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding monetary damages, including treble damages and statutory damages, to the extent permitted by law;

3.    Awarding punitive damages, to the extent permitted by law;

4.    Providing for any and all injunctive relief the Court deems appropriate;

5.    Awarding Plaintiffs pre-judgment interest and post-judgment interest, to the extent permitted by law;

6. Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts, and reimbursement of Plaintiffs' expenses; and

7. Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 2, 2023                    **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**


By:  /s/ Gary M. Klinger
     GARY M. KLINGER

GARY M. KLINGER
  gklinger@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878

RACHEL L. SOFFIN
  rsoffin@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: (865) 247-0080

HARPER T. SEGUI
  hsegui@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
825 Lowcountry Boulevard, Suite 101
Mt. Pleasant, South Carolina 29464

MELISSA S. WEINER
  mweiner@pwfirm.com
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone:  (612) 389-0600
Facsimile:  (612) 389-0610

DANIEL L. WARSHAW*
  dwarshaw@pwfirm.com
MICHAEL H. PEARSON*
  mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

ARI KRESCH*
  akresch@1800lawfirm.com
WENDY KERNER*
  wkerner@1800lawfirm.com
**KRESCH LEGAL SERVICES PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Telephone: (800) 529-3476

* *Pro Hac Vice* Forthcoming

*Attorneys for Plaintiffs and the Proposed Class*