**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| *JOHN BOHEN* and *ABDALLAH NASSER*, individually, and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>*CONAGRA BRANDS INC.*,<br><br>    Defendant. | Case No.: 1:23-cv-01298<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, John Bohen and Abdallah Nasser (hereinafter "Plaintiffs"), by their undersigned counsel, bring this First Amended Class Action Complaint against Defendant ConAgra Brands Inc., (hereinafter "ConAgra" or "Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to their acts and experiences, and as to all other matters, upon information and belief, including investigations conducted by Plaintiffs' attorneys.

<u>**NATURE OF THE SUIT**</u>

1.     In order to profit off of the sustainability conscious consumer, and to keep pace with consumer demands for sustainable seafood, ConAgra has engaged in a uniform, multi-channel, pervasive advertising campaign to market itself as a sustainable food manufacturer, acknowledging sustainability as a purchase driver when selling seafood in a market composed of health and environmentally conscious consumers.

2.      ConAgra is able to charge a premium for its Seafood Products[1] as a result of its uniform, pervasive sustainable seafood marketing campaign—a message it communicates to consumers most prominently through a "certified sustainably sourced" front-of-label representation on every Seafood Product package. ConAgra's sustainability promise is reinforced through its multi-channel marketing campaign that includes additional statements on its Product labeling that the Products are "certified sustainable seafood," "Good for you. Good for the Environment," a promise that ConAgra has "full traceability of all our fish," and a partnership with the Marine Stewardship Council ("MSC"),[2] which allows ConAgra to communicate ConAgra's corporate commitments to sustainably sourced Seafood through MSC's certification in the form of a blue stamp on each package (hereinafter the "Blue Tick") to help sell the Seafood Products (hereinafter and collectively, the "Sustainability Promise"). As shown herein, despite its Sustainability Promise, ConAgra sources its Seafood Products from fisheries that engage in fishing practices that indiscriminately harm marine life and ocean ecosystems.

3.      ConAgra has engaged in and crafted an intentional marketing campaign, which includes representations on the Seafood Product labels, authorized retailer websites, press tours, interviews, and press releases, all with the goal of delivering the uniform message to consumers that the Seafood Products are sustainable. As described herein, there is no question that ConAgra's Sustainability Promise emanates from a deliberate and manufactured company policy to convince consumers that the Seafood Products are sourced with "sustainable fishing practices that help to

---

[1] As described herein, "Seafood Products" or "Products" refer to Mrs. Paul's Crispy Battered Fillets, Crunchy Breaded Fillets, Fish Sticks, Fish Fingers, and Beer Battered Fillets, as well as Van De Kamp's Crispy Battered Fillets, Crunchy Breaded Fillets, Fish Sticks, and Beer Battered Fillets sold nationwide. The labels of the different varieties of Products are substantially similar in the representations made to consumers.

[2] D.S. Simon Media, *PR's Top Pros Talk… How to Make Sustainability Appealing – Katya Hantel*, https://www.youtube.com/watch?v=QQBm_ZT5j5Q, at 5:15-6:00 (last visited July 7, 2023).

protect marine habitats and maintain healthy fish population levels,"[3] and that its priorities in providing sustainable fish include preventing "overfishing" and reducing "ecosystem impacts" in order to ensure "Animal Welfare."[4]

4.      Through its Senior Director of Sustainability, ConAgra explained how it communicates its Sustainability Promise through social initiatives: "We spend a lot of time acting as translators and really taking …scientific data and quantif[ying] and turning it into a story that the average consumer can understand."[5]

5.      One component of this story is ConAgra's alliance with MSC, a company that provides certification for allegedly sustainable, wild-caught seafood to companies that pay to use its Blue Tick.

6.      ConAgra has touted its "partnership" with MSC, explaining in a press release that the partnership was intended to "bring more sustainably sourced fish options to American consumers and drive awareness of the importance of protecting marine ecosystems" including to "*help consumers feel confident that the fish they purchase meets rigorous standards*."[6]

---

[3] Caitlin Davy, *ConAgra Brands Partners with Marine Stewardship Council to Promote Certified Sustainable Seafood*, ConAgra Brands, Inc. (July 1, 2020), www.ConAgrabrands.com/news-room/news-ConAgra-brands-partners-with-marine-stewardship-council-to-promote-certified-sustainable-seafood-prn-122737 (last visited July 7, 2023).

[4] ConAgra Brands, *Responsible Sourcing*, www.ConAgrabrands.com/our-company/corporate-social-responsibility/responsible-sourcing (last visited July 7, 2023).

[5] D.S. Simon Media, s*upra*, n. 2, at 0:30.

[6] The Associated Press, *ConAgra Brands Partners with Marine Stewardship Council to Promote Certified Sustainable Seafood (July 1, 2020)* https://apnews.com/article/business-fish-72b89ccc970a032f32b899d557bf4fec (last visited July 7, 2023) (emphasis added).

7.      ConAgra's decision to utilize MSC as part of its overall sustainability campaign was highly calculated, as it admittedly uses "third-party non-profits as great communicators to help promote our story and give it authenticity that makes it meaningful for consumers."[7]

8.      ConAgra knows that conscientious consumers go shopping in search of sustainable products, which, in turn, drives market share. Reasonable consumers believe the fisheries used to source the Seafood Products are maintaining healthy fish populations and protecting ocean ecosystems. In fact, as described herein, ConAgra and MSC's standards themselves promise such protections of the oceans and marine life. ConAgra has acknowledged that unsustainable fishing practices—that no reasonable consumer would believe meet the definition of "sustainability"— include overfishing, illegal, unreported and unregulated fishing and destructive fishing practices, yet it has engaged in these very practices with respect to the Seafood Products bearing its Sustainability Promise.

9.      Sadly, despite its Sustainability Promise, ConAgra does not promote the health and preservation of marine ecosystems—a basic pillar of sustainability. Instead, while profiting off of the false and misleading Sustainability Promise, ConAgra conceals the use of harmful fishing practices used for its Seafood Products and hides behind the hollow MSC certification, which ConAgra has acknowledged is an important component to legitimizing its sustainability marketing campaign that makes the Seafood Products more appealing to an ever-growing environmentally conscious consumer base.

10.     Furthering its efforts to legitimize its Sustainability Promise, ConAgra represents that it has full traceability of the Seafood Products, from sea to table, which would include fish caught by MSC certified fisheries. Despite its traceability representation, the MSC certified

---

[7] D.S. Simon Media, *supra*, n.2, at 5:15-6:00.

fisheries that supply the fish for ConAgra's Seafood Products do not provide the promised protections and, instead, engage in the following conduct, which indisputably *defies* ConAgra's promise of sustainability: <u>the suffocation and crushing of sea lions, sharks, rays, whale sharks, whales and other species of concern caught in fishing nets that are then hauled onto fishing boats while severely injured or dead; the excessive capturing or harming of non-targeted prohibited species, such as snow crabs, and contributing to the failure of those species' populations; leaving marine animals to die on the decks or butchering them in the nets while they were still alive.; leaving abandoned, lost, or discarded fishing gear, also known as "ghost gear" in the water, which is the deadliest form of plastic in the ocean and greatly impacts marine life populations; and overfishing, resulting in the depletion of fish stocks and the demise of the fishing industry.</u>

11. Despite representing to consumers that it has "full traceability" of the Seafood Products, ConAgra turns a blind eye to the unsustainable fishing practices used in sourcing its Seafood Products and boldly uses the Sustainability Promise as proof of sustainable fishing methods. However, as ConAgra knew or should have known, its suppliers use industrial fishing methods that injure marine life as well as ocean habitats with destructive fishing.

12. By failing to disclose that its Seafood Products are *unsustainably* sourced through use of fishing methods that harm ocean habitats and marine life, and representing that the Seafood Products are sustainably sourced, ConAgra has induced reasonable consumers, including Plaintiffs and Class Members, to become unwitting participants in the very environmental crisis they attempt to avoid by purchasing and paying a premium for ConAgra's Seafood Products.

13. Reasonable consumers generally understand seafood to be "sustainably" sourced if it does not harm the marine ecosystem and promotes marine health. It thus follows that the many

*unsustainable* fishing practices described herein—which all indisputably harm the marine life and ecosystems—would not be considered "sustainable" by the reasonable consumer.

14.    Reasonable consumers are not required to look beyond the label and marketing representations to understand a company's promises. Here, the label representations alone (which are reinforced with a prominent marketing campaign), confirm a reasonable consumer's basic expectations of sustainability in purchasing allegedly "sustainable" products.[8]

15.    ConAgra's failure to ensure the truthfulness of the Sustainability Promise constitutes a violation of the explicit commitments it makes to consumers on each and every Seafood Product label. These baseless commitments include the assurance that ConAgra has the proper, company-wide monitoring in place to verify the sustainability and traceability of the fishing practices used to source the Seafood Products. Instead, ConAgra knew or should have known that the companies sourcing its Seafood Products engaged in unsustainable fishing methods, and also failed to ensure that the fisheries sourcing the Seafood Products only use sustainable means, making ConAgra's promises meaningless.

16.    Due to ConAgra's deceptive and misleading labeling, Plaintiffs and reasonable consumers purchased the Seafood Products based upon their reasonable belief and reliance on ConAgra's Sustainability Promise. Had Plaintiffs and Class Members been aware that ConAgra's Seafood Products are not sustainably sourced, Plaintiffs and Class Members would not have purchased the Seafood Products or would have paid less for the Products. Accordingly, Plaintiffs and Class Members have been injured by ConAgra's deceptive business practices.

---

[8] Caitlin Davy, s*upra* n. 3; Marine Stewardship Council, *About the MSC*, https://www.msc.org/en-us/about-the-msc (last visited July 7, 2023) (highlighting protection of healthy fish populations, careful management of ecosystems, and adaptations to changing environmental circumstances).

## JURISDICTION AND VENUE

17.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy: (1) is a class action involving more than 100 class members, (2) involves members of a proposed class with citizens of states that are different from ConAgra's home state, and (3) exceeds the sum or value of $5,000,000, exclusive of interests and costs.

18.     This Court has personal jurisdiction over ConAgra because ConAgra conducts and transacts substantial business in Illinois. ConAgra has intentionally and purposefully marketed, promoted, distributed, and sold the Products at issue in Illinois, rendering exercise of jurisdiction by Illinois courts permissible.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## PARTIES

**Plaintiffs**

20.     Plaintiff John Bohen resides in Upland, California and is a citizen of California. Throughout the relevant period, Plaintiff John Bohen purchased the Seafood Products at issue in this lawsuit and was exposed to and reasonably relied upon ConAgra's sustainable representations, including ConAgra's Sustainability Promise to consumers on the Seafood Product packaging. Specifically, Plaintiff Bohen purchased ConAgra's Mrs. Paul's Crunchy Breaded Fillets and Van de Kamp's Fish Sticks from local Corona, Lake Elsinore, and Temescal Valley, California retailers such as Walmart once or twice a month since approximately 2020 up until November 2022. Plaintiff Bohen reviewed the Seafood Product packaging as a whole, including the front-label representations, and reasonably believed from these representations that the Seafood Products

were sustainably sourced, meaning they were sourced in a manner that would not harm the marine ecosystem and promote marine health. In reasonable reliance on these representations, Plaintiff Bohen paid an increased cost for the Seafood Products, which were worth less than represented because the statements were not true and were highly misleading. The sustainability representations on the Seafood Product packaging, including those on the front label of the Seafood Products, were part of the basis of the bargain in that Plaintiff Bohen attributed value to those representations and Plaintiff Bohen would not have purchased the Seafood Products, or would not have purchased them on the same terms, if he knew the sustainability representations were untrue and/or misleading. Plaintiff Bohen paid a price premium for empty promises of sustainability that ConAgra did not keep. Had Plaintiff Bohen been aware that the sustainable representations made by ConAgra on the Seafood Product Packaging were untrue, he would have paid less for the Seafood Products, or would not have purchased them at all.

21. Plaintiff Abdallah Nasser resides in Woodbridge, Virginia and is a citizen of Virginia. Throughout the relevant period, Plaintiff Abdallah Nasser purchased the Seafood Products at issue in this lawsuit and was exposed to and reasonably relied upon ConAgra's sustainable representations, including ConAgra's Sustainability Promise to consumers on the Seafood Product packaging. Specifically, Plaintiff Nasser purchased ConAgra's Mrs. Paul's Crunchy Breaded Fillets and Van de Kamp's Crispy Battered Fillets from local Woodbridge, Virginia retailers such as Walmart in December 2022. Plaintiff Nasser reviewed the Seafood Product packaging as a whole, including the front-label representations, and reasonably believed from these representations that the Seafood Products were sustainably sourced, meaning they were sourced in a manner that would not harm the marine ecosystem and promote marine health. In reasonable reliance on these representations, Plaintiff Nasser paid an increased cost for the Seafood

Products, which were worth less than represented because the statements were not true and were highly misleading. The sustainability representations on the Seafood Product packaging, including those on the front label of the Seafood Products, were part of the basis of the bargain in that Plaintiff Nasser attributed value to those representations and Plaintiff Nasser would not have purchased the Seafood Products, or would not have purchased them on the same terms, if he knew the sustainability representations were untrue and/or misleading. Plaintiff Nasser paid a price premium for empty promises of sustainability that ConAgra did not keep. Had Plaintiff Nasser been aware that the sustainable representations made by ConAgra on the Seafood Product Packaging were untrue, he would have paid less for the Seafood Products, or would not have purchased them at all.

**Defendant**

22.     Defendant ConAgra Brands Inc. ("ConAgra") is incorporated in Delaware and has its principal place of business in Chicago, Illinois. ConAgra produces, processes, markets, and distributes frozen Russian pollock products.

## FACTUAL BACKGROUND

**I.      ConAgra Aggressively Markets itself as a Sustainable Food Manufacturer to Profit off of the Sustainably Conscious Consumer.**

23.     ConAgra has endeavored to market itself as a sustainable food manufacturer through marketing campaigns on both the product and brand level in an attempt to profit off of the sustainability conscious consumer.[9]

---

[9] Chris Coulter, GlobeScan, *What Will the Future Hold for the Conscious Seafood Consumer?*, SeafoodSource, https://www.seafoodsource.com/videos/conference-recordings/what-will-the-future-hold-for-the-conscious-seafood-consumer (Last visited July 7, 2023).

24.     Confirming that sustainably sourced seafood is a necessity to maintaining and increasing its market share, ConAgra's Brand Manager for Frozen Prepared Food, Logan Soraci, emphasized the importance of ConAgra's sustainability marketing campaign stating, "*Sustainability is no longer a 'nice to have' it's a must.*"[10]

25.     Consistent with Mr. Soraci's statement, consumers have ranked "no pollution to the environment" and "respect to fish welfare" as two of the four most important elements of sustainable aquaculture.[11]

26.     Further, research demonstrates that claims related to sustainability are perceived by many consumers to mean "produced according to higher animal welfare standards,"[12] and that consumers associate the term "sustainable" with environment and atmosphere preservation (80%) and animal welfare and protection (76%).[13]

27.     Nearly half of millennials value factors like social impact and transparency over traditional value drivers like price.[14] In fact, a survey by Cargill found that 88% of Americans (and 93% of millennials) are willing to pay more for sustainable and responsibly sourced seafood.[15]

---

[10] SeafoodSource, *supra* n. 9*,* at 34:41.

[11] *Id.*

[12] Katrin Zander et al., *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe*, 30 J. Int'l Food & Agribusiness Marketing 251 (Dec. 22, 2017).

[13] Krystle Morrison, *How Do Consumers Really Feel About Sustainability?*, Food Industry Executive (Jan. 25, 2022) https://foodindustryexecutive.com/2022/01/how-do-consumers-really-feel-about-sustainability/ (last visited July 7, 2023).

[14] Capitalizing on the shifting consumer food value equation. Rep. Deloitte Development, 2015, p. 2. Web. 24 Aug. 2017. <http://www.gmaonline.org/filemanager/FMI_GMA_Report_rev_008.pdf#sthash.EmnFgZaj.dpuf> (last visited July 7, 2023).

[15] Cargill survey: *Americans Will Splurge on Sustainable Seafood*, Undercurrent News, 17 Aug. 2017. Web. 24 Aug. 2017. https://www.undercurrentnews.com/2017/08/17/cargill-survey-americans-will-splurge-onsustainable-seafood/ (last visited July 7, 2023).

28.     Moreover, a study on consumer perception of the phrase "ecologically sustainable" found that a majority of consumers "expect eco-labelled seafood to be harvested in a way that reduces impact on the fish population or the marine environment."[16]

29.     ConAgra, as a sophisticated corporation, is well aware of this consumer demand. As discussed above, during a recent panel discussion titled "What Will the Future Hold for the Conscious Seafood Consumer," ConAgra's Brand Manager for Frozen Prepared Food highlighted the importance of ConAgra's sustainability marketing, stating "sustainability is part of consumer conversations in a way that they weren't just a few years ago. Part of consumer consciousness. Sustainability is no longer a 'nice to have' it's a must."[17]

30.     During an interview on the topic of "How to Make Sustainability Appealing,"[18] ConAgra's Senior Director of Sustainability, Katya Hantel, discussed ConAgra's strategy for communicating its sustainability efforts on the brand level, stating: "We spend a lot of time acting as translators and really taking …scientific data and quantif[ying] and turning it into a story that the average consumer can understand."[19]

31.     During this interview, ConAgra's Senior Director of Sustainability also talked about how ConAgra leverages certain brands to tell a sustainability story to the consumer:

> We have about 100 brands in our portfolio, not all of them we leverage to tell a sustainability story at the brand level. You have to come up with internally which brands are your communications priorities which of them have the most sustainable product attributes. Which of them appeal to consumers who are naturally more geared towards sustainability…these are the products that are sold in whole foods. These are the products that have a millennial profile, and you focus your storytelling on those. You'll never hit every brand in your portfolio, and you don't

---

[16] Loren McClenachan *et al.*, *Fair Trade Fish: Consumer Support for Broader Seafood Sustainability*, 17 FISH & FISHERIES 825 (Sept. 2016).

[17] SeafoodSource, *supra* n. 9, at 34:41.

[18] D.S. Simon Media, *supra* n. 2.

[19] *Id.* at 0:30.

need to for investors roll up the major impact into a master company story, but for the brands pick and choose where you're the most positioned to tell a strong story and focus there.[20]

32.    In particular, ConAgra's Director of Sustainability highlighted Mrs. Paul's and Van de Kamp's as two of the brands that ConAgra leverages to communicate its sustainability efforts to consumers:

> So, Mrs. Paul's and Van de Kamp's are two great seafood brands in our portfolio. We partnered with the MSC last year to relaunch those as *100 percent certified sustainable fish brands*. Using social media to tell the story to generate some traditional and social media interest in that type of program we had to take it to the brand level. *We also used third-party non-profits as great communicators to help promote our story and give it authenticity that makes it meaningful for consumers.*[21]

33.    Further recognizing the necessity of communicating its sustainability efforts to consumers, ConAgra promotes a citizenship strategy which includes four focus areas: Good Food, Responsible Sourcing, Better Planet, and Stronger Communities. Together, these strategic pillars articulate ConAgra's marketed values and ambitions as a responsible corporate citizen.[22]

34.    When promoting its citizenship strategy, ConAgra has stated that "adhering to the highest possible standards of integrity and ethical behavior is the only way to succeed, and so the company has set the highest standards for the way it conducts business, in areas from corporate and social responsibility to sound business ethics."[23]

35.    ConAgra describes its Corporate Social Responsibility as "Nourishing our people, the planet and our communities" and claims that "We aim to do what's right for our business, our employees, our communities and the world. This means making food that is delicious, safe

---

[20] D.S. Simon Media, *supra* n.2, at 6:25-7:20.

[21] *Id*. at 5:15-6:00.

[22] ConAgra Brands, Inc., *Code of Conduct for Suppliers*, p. 1 (Oct. 19, 2021).

[23] *Id*.

nutritious and convenient while addressing the key environmental and social impacts linked to our products. We look forward to making good food for generations to come in a way that is consistent with our values."[24]

36.    The same 2022 Citizenship Report identifies "sustainable sourcing" as a corporate "strategic priority" based on the interests of its stakeholders and corporate business strategy.[25]

37.    As it relates to ConAgra's Seafood Products, Vice President and General Manager, Lindsay Brady, stated that ConAgra's goal for sustainable sourcing of its Seafood Products is to align with the United Nations' Sustainable Development Goal 14: Life Below Water.[26] The U.N.'s Sustainable Development Goal 14 is "about conserving and sustainably using the oceans, seas and marine sources,"[27] which includes Goal 14.4:

> By 2020, effectively regulate harvesting and end overfishing, illegal, unreported and unregulated fishing and destructive fishing practices and implement science-based management plans, in order to restore fish stocks in the shortest time feasible, at least to levels that can produce maximum sustainable yield as determined by their biological characteristics.[28]

38.    In addition to its front-of-label promises ("certified sustainably sourced" as well as the Blue Tick and "Certified Sustainable Seafood" promise), ConAgra communicates its commitment to sustainability on the back of the packaging ("Good for you. Good for the

---

[24] ConAgra Brands.com, *Corporate Social Responsibility*, https://www.ConAgrabrands.com/our-company/corporate-social-responsibility (last visited July 7, 2023).

[25] ConAgra Brands, *Citizenship Report 2022*, Citizenship Strategy, p. 9.

[26] Caitlin Davy, *supra* n. 3; The Associated Press, *supra* n. 6; Nasdaq, Inc., *ConAgra Brands Partners with Marine Stewardship Council to Promote Certified Sustainable Seafood*, dated July 1, 2020; FronzenFoodsBiz.com, *ConAgra Brands Partners with Marine Stewardship Council to Promote Certified Sustainable Seafood*, dated July 1, 2020.

[27] United Nations, Sustainable Development Goals, *Goal 14: Conserve and Sustainably use the Oceans, Seas and Marine Resources*, https://www.un.org/sustainabledevelopment/oceans/ (last visited July 7, 2023).

[28] *Id.*

Environment," "full traceability of all our fish"), utilizing as much label real estate as possible to communicate its sustainable message to consumers. Examples of these representations on ConAgra's Products can be seen in the images below:

  



---

[29] Safeway.com, Van de Kamp's Fish Sticks, www.safeway.com/shop/product-details.960081538.html (last visited July 7, 2023); Walmart.com, Van de Kamp's Fish



30

---

Stickshttps://www.walmart.com/ip/Van-de-Kamp-s-Wild-Caught-Crunchy-Breaded-Fish-Sticks-24-6-oz-44-Ct-Frozen/10804921 (last visited July 7, 2023).

30 Walmart.com, Mrs. Paul's Beer Battered Fish Fillets, https://www.walmart.com/ip/Mrs-Paul-s-Beer-Battered-Fish-Fillets-19-1-oz-10-Ct-Frozen/10849440?wmlspartner=wlpa&selectedSellerId=0&wl13=5867&adid=22222222277108
49440_117755028669_12420145346&wmlspartner=wmtlabs&wl0=&wl1=g&wl2=c&wl3=501
107745824&wl4=pla-294505072980&wl5=1023191&wl6=&wl7=&wl8=&wl9=pla&wl10=8175035&wl11=local&wl
12=10849440&wl13=5867&veh=sem_LIA&gclid=EAIaIQobChMIqO2pyKTm_wIVVQKtBh2
76gNCEAQYAyABEgKmcvD_BwE&gclsrc=aw.ds (last visited July 7, 2023).



---

[31] Walmart.com, Mrs. Paul's Beer Battered Fish Fillets, https://www.walmart.com/ip/Mrs-Paul-s-Beer-Battered-Fish-Fillets-19-1-oz-10-Ct-Frozen/10849440?wmlspartner=wlpa&selectedSellerId=0&wl13=5867&adid=22222222277108 49440_117755028669_12420145346&wmlspartner=wmtlabs&wl0=&wl1=g&wl2=c&wl3=501 107745824&wl4=pla-294505072980&wl5=1023191&wl6=&wl7=&wl8=&wl9=pla&wl10=8175035&wl11=local&wl 12=10849440&wl13=5867&veh=sem_LIA&gclid=EAIaIQobChMIqO2pyKTm_wIVVQKtBh2 76gNCEAQYAyABEgKmcvD_BwE&gclsrc=aw.ds (last visited July 7, 2023).

II. **ConAgra's Fisheries and Suppliers of the Seafood Products Utilize Unsustainable Fishing Methods and Lack the Traceability Necessary to Substantiate Conagra's Sustainability Promise.**

39. Contrary to the Sustainability Promise marketed by ConAgra to profit off of the sustainably conscious consumer, ConAgra's Seafood Product suppliers utilize harmful fishing techniques that injure marine wildlife and the marine ecosystem. Furthermore, ConAgra's Seafood Product suppliers lack the traceability and supply chain transparency required to make such sustainability claims.

40. Sustainable fishing indisputably "guarantees there will be populations of ocean and freshwater wildlife in the future."[32] As seafood demand has grown and advances in technology have expanded, certain fishing practices deplete fish populations, leading to unsustainable fishing practices.[33]

41. ConAgra's Products are sourced in the Bering Sea by Russian fisheries that use pelagic midwater trawls.[34] Those Russian pollock fisheries using pelagic trawls have failed to

---

[32] Sustainable Fishing, National Geographic Society, https://education.nationalgeographic.org/resource/sustainable-fishing. (last visited July 7, 2023).

[33] *Id.*

[34] Citizenship Report, *supra* n. 25; John Fiorillo, *US Retail Brands, Fast Food Chains Sourcing Russian Fish Find Themselves in Tightening Vice*, Intrafish (Mar. 1, 2022), https://www.intrafish.com/trade/us-retail-brands-fast-food-chains-sourcing-russian-fish-find-themselves-in-tightening-vice/2-1-1174986 (last visited July 7, 2023); Marine Stewardship Council, Track a Fishery, Pollock https://fisheries.msc.org/en/fisheries/@@search?q=pollock&term=&bucket=&__start__=fishery_name%3Asequence&fishery_name=fishery+shipowners+association+%28fsa%29+western+bering+sea+walleye+pollock&fishery_name=western+bering+sea+pollock&__end__=fishery_name%3Asequence&__start__=uoc_status%3Asequence&uoc_status=certified&__end__=uoc_status%3Asequence&__start__=species%3Asequence&species=walleye+pollock+-+gadus+chalcogrammus+%3D+theragra+chalcogramma&__end__=species%3Asequence&__start__=gear_type%3Asequence&__end__=gear_type%3Asequence&__start__=location%3Asequence&location=61+%28pacific%2C+northwest%29&__end__=location%3Asequence&__start__=certificate_number%3Asequence&__end__=certificate_number%3Asequence&filter=Update+Results#fndtn-results-tab (last visited July 7, 2023).

maintain healthy fish populations and have caught excessive amounts of juvenile pollock as bycatch.[35]

42.     The Western Bering Sea Pollock fishery operated by Pollock Catcher Association (PCA) is based out of Vladivostok, Svetlanskaya, and Russia received its MSC certification in January 2023.[36] The Final Draft Report for the Initial Assessment of PCA noted that "the overall level of bycatch and discards (including target species) and the occurrence of ETP species is not monitored to a level that generates confidence in all. Although the scientific observer programme was substantially enhanced in the years up to 2019, it still covers just 8-11% of total trawl sets. Although this can be sufficient for monitoring the most frequently observed species, such coverage is probably insufficient."[37] The Initial Assessment also notes that the PCA has a "lack of a comprehensive, systematic ecosystem approach to fishery management. […] There are no regular reviews of the effect of the fishery on other species and no specific mitigation plans or evidence that such plans are not needed. The [PCA] has the ability to initiate its code of conduct with ecosystem protective elements but has not done so yet."[38]

43.     The PCA was subjected to a Surveillance Audit Report in May 2023, in which the PCA was found to have failed to take any direct work to address the reporting of potential midwater trawl gear interactions with habitat (the sea bottom).[39] The Surveillance Audit Report goes on to

---

[35] Marine Conservation Society, *Sustainability Rating Alaska pollock (theragra chalcogramma)*, https://www.mcsuk.org/goodfishguide/ratings/wild-capture/29/ (last visited July 7, 2023).

[36] MCS Fishery Certification, PCA, MSC-F-31513 (Jan. 4, 2023).

[37] Western Bering Sea Pollock, Pollock Catchers Association, *Initial Assessment*, Final Draft Report, p. 12 (June 2021).

[38] *Id.* at p. 13.

[39] Wester Bering Sea Alaska (Walleye) Pollock mid-water trawl, Pollock Catchers Association, *First Surveillance Audit*, Surveillance Audit Report, p. 6(May 22, 2023).

note that there is a risk that the current standards for stock assessment methodology for verification presents a risk of the pollock stock falling below sustainable levels.[40]

44.     Similarly, the initial assessment of the Fishery Shipowners Association (FSA) which is based out of Moscow, Trubnaya, Russia, highlights concerns about the operation of its fisheries.[41] The Initial Report addresses a concern about "the uncertainty related with the stock configuration" as well as a "lack of comprehensive information on about interaction with seabird and marine mammals."[42]

45.     Despite these clear concerns with the sustainability of ConAgra's Seafood Product suppliers, ConAgra has failed to take any action to report, assist, or correct these suppliers in accordance with its Code of Conduct for Suppliers and its Sustainability Promise.

46.     ConAgra has failed to consider the impact that Russian fisheries' harmful pelagic trawl practices, compounded with climate change, have had on the environment and how these practices have contributed to, for example, the decimation of the snow crab population in the Bering Sea.

47.     A pelagic trawl is a large conical net with a horizontal opening that is towed through midwater depths. The net can be as wide as two football fields and as deep as 160 yards.

48.     A pelagic trawl is a non-selective method of catching fish. When a pelagic trawl is dragged through the water, all marine life within the net is captured, including marine mammals.[43]

---

[40] PCA First Surveillance Audit, *supra* n. 39.

[41] Fishery Shipowners Association (FSA) Western Bering Sea Walleye Pollock, Fishery Shipowners Association (FSA, Russian Federation), *Final Draft Report*, Initial Assessment (Apr. 18, 2022).

[42] *Id*. at p. 10.

[43] NOAA, *Fishing Gear: Midwater Trawls*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-midwater-trawls (last visited July 7, 2023).

Most marine mammals swim at mid-water depths, which puts them at high risk of being captured in these nets.[44] These non-target species are called bycatch and often drowned or are crushed by the weight of the other catch that has accumulated on top of them.

49.     "Bycatch" refers to the unintentional hooking or ensnaring of marine life.[45] A report from the National Resources Defense Council states that scientists estimate over 650,000 marine mammals are killed or seriously injected every year as a result of incidental bycatch.[46]

50.     Despite this already staggering number, the figure is likely even higher since commercial fishermen are incentivized to underreport bycatch, which is facilitated by rampant lack of accountability and widespread unreliable reporting on bycatch. In fact, in 2005, less than half of the fishing vessels around the world recorded quantitative statistics on annual bycatch.[47]

51.     Bycatch levels are ignored by ConAgra because, according to the fisheries' certifying body, MSC, the levels are arbitrarily considered "sustainable."[48]

52.     The fisheries purport to have observers on board that monitor bycatch. However, there is evidence that observers' reports about bycatch, shark finning, and observer bribery are being ignored.[49] Such evidence includes images of shark finning and the capturing of whale sharks,

---

[44] NOAA, *supra* n. 43.

[45] Ecological Damage Caused by Driftnets, JRANK, https://science.jrank.org/pages/2162/DriftNet.html#:~:text=Drift%20nets%20are%20used%20to,dead%2C%20back%20to%20the%20ocean (last visited July 7, 2023).

[46] Net Loss: The Killing of Marine Mammals in Foreign Fisheries, National Resources Defense Council (January 2014), https://www.nrdc.org/sites/default/files/mammals-foreign-fisheriesreport.pdf (last visited July 7, 2023).

[47] Amanda Keledjian, et al., *Wasted Catch: Unsolved Problems in U.S. Fisheries*, OCEANA (2014), available at https://oceana.org/reports/wasted-catch-unsolved-problems-us-fisheries/ (last visited July 7, 2023).

[48] *SEASPIRACY* (Ali Tabrizi dir., 2021).

[49] J Schwenzfeier et al., *Slipping Through the Net, Reported but Ignored: Infringements in the MSC Tuna Fisheries of the Western and Central Pacific*, Shark Guardian (May 2022).

giant rays, and other species of concern.[50] More graphically, fishers have left marine animals to die on the decks or butchered them in the nets while they were still alive.[51]

53.     As it relates to the sourcing of pollock, the fish contained in the Seafood Products, Russian pollock fisheries do not have an effective measure in place to protect endangered species, such as Steller sea lions and albatross.[52]

54.     Steller sea lions, an endangered species that occupy the Bering Sea, are prone to getting caught in these nets because they prey upon pollock. From 2016 to 2020, documented Steller sea lion deaths were generally linked to pelagic trawl incidents, making up the majority of marine mammals entangled in discarded fishing gear.[53]

55.     Pollock trawl fisheries in the Bering Sea also frequently catch snow crab as bycatch, which they ultimately discard. Due to the use of pelagic trawls, these discarded crabs are estimated to have an 80% mortality rate.[54]

---

[50] J Schwenzfeier et al., *supra* n.49.

[51] *Id.*

[52] Ivan Stupachenko, *Russia Nets Two New MSC Certifications for Shrimp and Pollock*, Seafood Source (Sept. 9, 2021), https://www.seafoodsource.com/news/environment-sustainability/russia-nets-two-new-msc-certifications-for-shrimp-and-pollock (last visited July 7, 2023); Greenpeace, Assessment of the Marine Stewardship Council (MSC) Fisheries Certification Programme. June 2009. p. 7, para 4.4.2 https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/planet3/PDFs/assessment-of-the-msc.pdf (last visited July 7, 2023).

[53] Yereth Rosen, *Steller Sea Lions Most Likely Victims of Human-Caused Marine Mammal Deaths in Alaska*, Alaska in Brief (Aug. 18, 2022), https://alaskabeacon.com/briefs/steller-sea-lions-most-likely-victims-of-human-caused-marine-mammal-deaths-in-alaska/ (last visited July 7, 2023).

[54] North Pacific Fishery Management Council, Crab Bycatch (2022), https://www.npfmc.org/fisheries-issues/bycatch/crab-bycatch/#:~:text=Bycatch%20of%20crab%20occurs%20both,as%20groundfish%20and%20scallop%20fisheries (last visited July 7, 2023).

56.     Although they are supposed to catch pollock in midwater, these pelagic trawls will scrape the bottom of the ocean at an 80% rate.[55] This constant contact with the seabed harms the benthic environment and crushes snow crabs that live in the path of the trawlers.[56]

57.     These unsustainable practices have contributed to the dramatic decline in the population of snow crabs in the Bering Sea over the past five years. During the recent 2022 season, the population collapsed, decreasing by the billions. Given the drastic impact of these practices, the snow crab harvest for 2022 was canceled.[57]

58.     Moreover, despite ConAgra's stated sustainability goal of compliance with the United Nations' Sustainable Development Goal 14, the United Nations has never considered pelagic trawl net fishing as "sustainable" or consistent with the UN's Sustainable Development Goal 14. To the contrary, the UN continues to recognize the ongoing concern that "the practice of large-scale pelagic drift-net fishing remains a threat to marine living resources."[58]

59.     In addition to using harmful pelagic trawling to catch the Seafood Products, ConAgra's Seafood Product suppliers are not required to provide effective strategies for mitigating ghost gear. Abandoned, lost, or discarded fishing gear, also known as "ghost gear," is the deadliest

---

[55] Hal Bernton, *Into The Ice: A Crab Boat's Quest for Snow Crab in a Bering Sea Upended by Climate Change*, Seattle Times (April 3, 2022), https://www.seattletimes.com/seattle-news/environment/into-the-ice-a-crab-boats-quest-for-snow-crab-in-a-bering-sea-upended-by-climate-change/ (last visited July 7, 2023).

[56] *Id.*

[57] Joanna Thompson, LiveScience.com, *What Made Billions of Snow Crabs Disappear from the Bering Sea?*, https://www.livescience.com/billions-snow-crabs-vanish-from-bering-sea (last visited July 7, 2023).

[58] U.N., G.A. Res., 55/8 (Mar. 2, 2001); G.A. Res. 57/142 (Feb. 26, 2003); G.A. Res. 50/25 (1995); G.A. Res 53/33 (Jan. 6, 1999); G.A. Res. 52/29 (Jan. 26, 1998); G.A. Res. 46/215 (1991).

form of plastic in the ocean and it greatly impacts marine life populations, including whales, dolphins, sharks, and sea turtles.[59]

60.     Even more, despite ConAgra's claim that it has "full traceability" of the Seafood Products, ConAgra's suppliers lack the transparency necessary to support such a claim, furthering ConAgra's deceptive conduct.

61.     Traceability is the guarantee that both food retailers and consumers need before any sustainability claims can truly be accepted and verified, and in many ways, it is the glue that holds the responsibly sourced products' supply chains together.[60]

62.     Traceability and supply chain transparency is vital to verify sustainability and demonstrate that a product is ethically and sustainably sourced.[61] In the seafood sector, effective traceability can be defined as the ability to identify the origin of the product and sources of input materials, as well as the ability to conduct backward and forward tracking using recorded information to determine the specific location and history of the product.[62]

63.     However, effective traceability can only be accomplished if neutral observers are adequately reporting unstainable fishing practices. As described above, Conagra knew or should have known that the observers utilized by ConAgra's Seafood Product suppliers, which are MSC

---

[59] Ingrid Giskes, *Ghost Gear Prevention in the Seafood Industry*, Ocean Conservancy (Feb. 2, 2021), https://oceanconservancy.org/blog/2021/02/02/ghost-gear-prevention-seafood-industry/ (last visited July 7, 2023).

[60] Greenpeace, *Sea of Distress 2017*, https://www.greenpeace.org/usa/wp-content/uploads/2017/10/Sea-of-Distress-2017.pdf (last visited July 7, 2023).

[61] Traceability in Farmed Shrimp, WWF, https://seafoodsustainability.org/aquaculture/farmedshrimp/traceability/#:~:text=Without%20visibility%2C%20it%20is%20impossible,is%20ethically %20and%20sustainably%20sourced (last visited July 7, 2023).

[62] Traceability - is your seafood really what is says on the tin?, ASC AQUA, https://www.ascaqua.org/aquaculture-explained/is-the-asc-a-credible-standard/traceability-is-your-seafood-really- what-it-says-on-the-tin/ (last visited July 7, 2023).

certified, fail to adequately report and record bycatch and other dangers or harm to marine wildlife and ecosystems.

64.     As noticed by the Association for Professional Observers, "broad assessments are made that a fishery is sustainable if it is MSC certified or has some other eco-label. This is a public deception. To us, these milestones are a complete farce because there are no observer protections embedded in the requirements of any eco-certification. Furthermore, they mean nothing without transparency of observer reports and continual public oversight."[63]

65.     Despite ConAgra's bold claims of traceability, Conagra and MSC lack criteria to protect observers or the metrics to gauge the effectiveness of observer program management,[64] as even MSC has admitted.[65] Understanding trends in observer interference first comes with public transparency. If agencies are not systematically reporting incidents of interference publicly, consumers are simply being duped into believing the monitoring program is effective and the fish they eat are sustainable.[66]

66.     The lack of transparency, combined with the self-policing nature of the industry allows fish retailers like ConAgra to reap the benefits of harmful fishing practices all while falsely promising customers that its Products are sustainably sourced.

---

[63] Mitchell, Elizabeth, *An Open Letter to Ocean Activists and Marine Conservation Groups from the Association for Professional Observers*, Nov. 18, 2016. https://apo-observers.s3.us-west-2.amazonaws.com/wp-content/uploads/2021/01/18102147/open-letter-ocean-activists-nov-2016.pdf (last visited July 7, 2023).

[64] Association for Professional Observers (APO), *Observer Harassment*, https://www.apo-observers.org/observer-safety/harassment/ (last visited July 7, 2023).

[65] PCA First Surveillance Audit, *supra* n.39, at p. 6; FSA, Final Draft Report, *supra* n. 41.

[66] APO, *supra* n. 64.

III.     **ConAgra Knew or Should Have Known that its Fisheries and Fishing Practices, including those Certified by its Partner, MSC, Breached ConAgra's Sustainability Promise.**

67.     Despite ConAgra's aggressive marketing campaign to profit off of the sustainably conscious consumer of the Seafood Products, ConAgra's Sustainability Promise lacks any merit and only serves to deceive Plaintiffs and other reasonable consumers into purchasing Seafood Products that are unsustainably sourced through the use of fishing methods that harm ocean habitats and marine life, forcing those consumers into becoming unwitting participants in the very environmental crisis they attempt to avoid by purchasing and paying a premium for ConAgra's Products.

A.     *ConAgra Partnered with the Marine Stewardship Council to Further its Deceptive and Misleading Sustainability Promise Campaign to Consumers.*

68.     While ConAgra has attempted to plead ignorance beyond the MSC Blue Tick, its arguments are unavailing and contradict the countless statements ConAgra has made regarding its alleged traceability of the Seafood Products, including the Code of Conduct that its fish suppliers must follow.

69.     The Blue Tick has been adopted and incorporated into ConAgra's sustainability marketing campaign and is part of ConAgra's Sustainability Promise.

70.     ConAgra has even admitted this with statements that ConAgra uses "third-party non-profits as great communicators to help promote our story and give it authenticity that makes it meaningful for consumers."[67]

71.     In 2018, ConAgra identified Van de Kamp's and Mrs. Paul's as two products to leverage ConAgra's story of sustainability to the conscientious consumer.[68] ConAgra understood

---

[67] D.S. Simon Media, *supra* n. 2, at 5:15-6:00.

[68] *Id*. at 5:15-7:20.

that the best way to communicate its Sustainability Promise on the brand level was through the addition of a third-party certification, such as MSC's Blue Tick.[69] This decision was supported by consumer reports which found that a conscientious consumer is more likely to purchase a sustainably marketed product where it has been certified by a third-party as opposed to solely a claim from the manufacturer itself.[70] Thus, ConAgra is not simply relying upon a third-party certification; rather, it is *using* the third-party certification, in part, to communicate its own commitment to sustainability.

72.     On July 1, 2020, ConAgra issued a press release announcing its partnership with MSC stating: "Van de Kamp's and Mrs. Paul's products adopt 100% sustainably sourced fish."[71] The advertised goal of ConAgra's partnership with MSC was "to bring more sustainably sourced fish options to American consumers and drive awareness of the importance of protecting marine ecosystems."[72] According ConAgra's Vice President and General Manager:

> Driving adoption of sustainably sourced seafood is key to a healthy planet… Approximately one-third of fisheries around the world have been fished beyond sustainable limits, with another 60% fished to their maximum capacity. By sourcing MSC-certified seafood for our key frozen fish products and educating consumers on its benefits, *we support responsible fishing practices and help consumers feel confident that the fish they purchase meets rigorous standards*.[73]

73.     As part of its marketing scheme, beginning in the summer of 2020, ConAgra's Van de Kamp's and Mrs. Paul's frozen fish fillets and fish sticks bore the MSC blue fish label,

---

[69] D.S. Simon Media, *supra* n. 2, at 5:15-7:20; SeafoodSource, *supra* n. 9, at 24:24.

[70] SeafoodSource, *supra* n. 9, at 24:24.

[71] News Release, *supra* n. 3.

[72] *Id*.

[73] The Associated Press, *supra* n. 6 (emphasis added).

indicating the wild-caught fish has been third-party certified for sustainable fishing practices that help to protect marine habitats and maintain healthy fish population levels.[74]

74.    In reliance upon the consumer studies that "people want independent labeling of environmental claims"[75] ConAgra's Senior Director of Sustainability stated that the partnership with MSC and third-party non-profits were used "as great communicators to help promote ConAgra's story and give it authenticity that makes it meaningful for consumers."[76]

**B.**    ***ConAgra's Representation that it Has Full Traceability of its Seafood Suppliers Which Must follow ConAgra's Code of Conduct, is Deceptive and Misleading.***

75.    ConAgra seeks to have it both ways: pleading ignorance to the harmful practices of the fisheries behind the MSC certification, while also using the MSC certification to advance its deceptive Sustainability Promise that ConAgra has full traceability of fish caught by the MSC certified fisheries, from sea to table.

76.    To help convince the sustainably conscious consumer of its sustainability goals, ConAgra has represented in its marketing and labeling materials that it has traceability and oversight of its suppliers. To support these statements, ConAgra adopted a so-called Code of Conduct for Suppliers that provides "a guideline of expectations, highlighting some key laws and regulations, as well as outlining additional requirements that ConAgra Brands expects its suppliers to meet."[77]

---

[74] News Release, *supra* n. 3.

[75] SeafoodSource, *supra* n. 9, at 19:10.

[76] D.S. Simon Media, *supra* n. 2, at 5:15-6:00.

[77] ConAgra Brands, Inc., *Code of Conduct for Suppliers*, at p. 1 (Oct. 19, 2021).

77. ConAgra's 2022 Citizenship Report identifies the Code of Conduct for Suppliers as a "critical priority" for the corporation.[78] The Code of Conduct for Suppliers applies across the board to all of ConAgra's direct suppliers—including the fisheries that supply the fish for ConAgra's Seafood Products—and states:

> Each requirement within ConAgra's Code of Conduct for Suppliers must be met and supported by appropriate documentation. *ConAgra maintains full rights to inspect facilities and review applicable documentation to confirm compliance.* ConAgra's Supplier Code of Conduct also specifies that our suppliers must take reasonable actions to verify that their suppliers and subcontractors are in compliance with ConAgra's Code of Conduct for Suppliers. ConAgra provides guidance to its suppliers regarding subcontracting and require them to replicate our requirements all the way down their supply chain. *ConAgra uses a rigorous due diligence process to confirm that we have appropriate documentation* regarding new suppliers and the materials we purchase from them. This includes, but is not limited to, spec sheets, allergen information, conflicts of interest disclosures, third-party audits and country of manufacture statements. 100% of our direct suppliers are monitored for controversies daily on an ongoing basis and we have implemented additional risk management processes for high-volume suppliers and suppliers of priority ingredients and packaging materials that may present heightened risks.[79]

78. ConAgra represents that it expects its suppliers will act in an environmentally and socially responsible manner and allegedly requires its suppliers to support sustainability and traceability efforts of goods and services throughout the supply chain.[80]

79. ConAgra acknowledges that the conduct of its suppliers can be attributed to ConAgra and its reputation, and as a result, ConAgra states that it takes an active role in supporting, coordinating, and investigating its suppliers in accordance with the Code of Conduct for Suppliers.[81]

---

[78] Citizenship Report 2022, *Citizenship Strategy*, *supra* n. 25, at p. 9.

[79] Citizenship Report 2022, *Supplier Risk Management*, *supra* n. 25, at p. 19.

[80] Code of Conduct for Suppliers, *Environmental & Social Impact, supra* n. 77, at p. 3.

[81] *Id.*

80.     ConAgra therefore cannot point the finger at MSC for its wrongdoing, as ConAgra allegedly has its hands in all aspects of the supply chain and is a sophisticated company that is well aware of the utility of the Blue Tick to its overall sustainability marketing campaign, which ConAgra has carefully crafted to keep pace with consumer demand. Thus, the Seafood Products stamped with the Blue Tick are part of ConAgra's campaign to encourage consumers to switch to seafood certified by MSC's allegedly rigorous 'blue fish' standard.[82]

### C.     *ConAgra Has Deceived and Misled Reasonable Consumers by Failing to Adhere to its Sustainability Promise.*

81.     With its unreasonable reliance on the MSC certification, its failure to adhere to its own marketing statements regarding traceability, and its knowledge of the unsustainable fishing practices of its Seafood Product Suppliers, ConAgra has failed to adhere to its own Sustainability Promise and has therefore deceived and misled reasonable consumers.

82.     ConAgra, through the Sustainability Promise that appears on all of its Seafood Products and is pervasive throughout its marketing, has consistently conveyed to consumers that its sustainably sourced Products promote the protection of fish stocks and marine life.

83.     ConAgra confirms the reasonable consumer's understanding of its Sustainability Promise on its website, stating that the Products are from "well-managed, sustainable fisheries," that "impacts on marine ecosystems are minimized,"[83] and on the Products' packaging that claim the Products are "Good for you. Good for the Environment" and that ConAgra maintains "full traceability of all its fish." Thus, ConAgra's definition is directly in line with that of reasonable

---

[82] News Release, *supra* n. 3.

[83] ConAgra Brands, *Mrs. Paul's: About Us*, https://www.mrspauls.com/about-us (last visited July 7, 2023); ConAgra Brands, *Van de Kamp's: About Us,* https://www.vandekamps.com/about-us (last visited July 7, 2023).

consumers: "sustainable" fishing practices do not harm the marine ecosystem and promote marine health.

84.     In reality, ConAgra knew or should have known the Products are sourced using unsustainable fishing practices that harm fish populations and kill marine life, such as dolphins, whales, sea lions, seabirds, and sharks, some of which are endangered.

85.     Federal guidance and consumer research demonstrate that sustainability claims, like those proffered by ConAgra, suggest to reasonable consumers that the Products are sourced through sustainable methods and in accordance with fishing techniques that promote healthy ecosystems. MSC itself highlights maintenance of healthy fish populations and careful management of ecosystems as pillars of sustainable fishing practices.[84] It thus follows that no reasonable consumer would consider fishing with a pelagic trawler to be "sustainable."

86.     The Federal Trade Commission's ("FTC") Green Guides ("Green Guides") were codified to "help marketers avoid making environmental marketing claims that are unfair or deceptive" based on its "views on how reasonable consumers likely interpret [those] claims."[85] The Green Guides are strong indicators of a reasonable consumer's understanding of sustainability practices.

87.     The FTC determined that "[u]nqualified general environmental benefit claims . . . likely convey that the product . . . has specific and far-reaching environmental benefits and may convey that the item . . . has no negative environmental impact."[86] In fact, the FTC has warned

---

[84] Marine Stewardship Council, *What is the MSC?,* https://www.msc.org/en-us/about-the-msc. (last visited July 7, 2023).

[85] FTC Green Guides, 16 C.F.R. § 260.1(a), (d) (2012).

[86] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, Federal Trade Commission (Apr. 2, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/04/ftc-

that "[m]arketers still are responsible for substantiating consumers' reasonable understanding of these claims."[87]

88.     ConAgra's Brand Manager for Frozen Prepared Food acknowledged this responsibility: "from a food manufacturer standpoint we have a responsibility to bring products to market with the planet's best interest in mind and in doing so and delivering these consumers intentions we need to be sure that we are as adequately and clearly communicating these things making them as easy to shop as humanly possible."[88]

89.     Despite the FTC Green Guides, the unsustainable fishing practices of its suppliers, and the well-documented failures of MSC to enforce its "certified" sustainability standard, discussed herein, all of ConAgra's Products uniformly include the Sustainability Promise on the front of the product packaging where it cannot be missed by consumers.

90.     Moreover, despite known concerns with MSC certification, ConAgra's decision to partner with MSC was the result of consumer research and determined to be the most effective way to communicate ConAgra's Sustainability Promise to the consumer. As ConAgra's Brand Manager for Frozen Prepared Seafood stated: "This is the shortcut that consumers are looking for and the value of the MSC label to the brand is significantly consistent over time."[89]

91.     ConAgra's Sustainability Promise and the use of the MSC "shortcut" misleads the reasonable consumer into believing that they are purchasing a sustainably sourced Product.

---

sends-warning-letters-companies-regarding-diamond-ad-disclosures (last visited July 7, 2023); *see* also FTC Green Guides, 16 C.F.R. § 260.4(b) (2012).

[87] FTC, The Green Guides, *Statement of Basis and Purpose*, p. 258 (Oct. 1, 2012) https://bit.ly/2TQ7GL9 (last visited July 7, 2023).

[88] SeafoodSource, *supra* n. 9, at 17:48.

[89] *Id*. at 26:08.

Contrary to the representations, the Products are not sustainably sourced, leaving the Plaintiffs and Class Members having paid a premium for Products that failed to provide the promised benefits.

### D. *ConAgra Knew or Should have Known that MSC Certified Fisheries, Which ConAgra Allegedly Monitors for Traceability and Compliance with ConAgra's Code of Conduct, Engage in Unsustainable Fishing Practices.*

92. As described *supra*, the fisheries that supply the Seafood Products to ConAgra engage in unsustainable fishing practices that injure marine wildlife and the marine ecosystem.

93. Experts are concerned, and ConAgra is aware or should have been aware of this concern, that the rapid growth of the MSC and the inherent conflict of interest involved with its operations have influenced the MSC to compromise its objective.

94. Globally, researchers, academics, and scientists have criticized the MSC for disregarding its own standards and compromising its credibility.

95. Richard Page, a Greenpeace Oceans Campaigner, said decisions to certify some fisheries "seriously undermine" the MSC's credibility. "I will go as far as to say consumers are being duped. They think they are buying fish that are sustainable and can eat them with a clean conscience."[90]

96. Rory Crawford, the MSC's own advisory council and a member of Bird Life International, conducted a study of 23 fisheries in 2019 and found that only three were actively working to monitor and minimize bycatch. "Consumers cannot be fully confident that certified fish comes without impacts on non-target species, from sharks to seabirds to whales."[91]

---

[90] Richa Syal, *License to Krill: the Destructive Demand for a 'Better' Fish Oil*, The Guardian (Sept. 7, 2021), https://www.theguardian.com/environment/2021/sep/07/license-to-krill-the-destructive-demand-for-a-better-fish-oil (last visited July 7, 2023).

[91] Karen Mc Veigh, *Blue Ticked Off: The Controversy Over the MSC Fish 'Ecolabel'*, The Guardian (July 26, 2021), https://www.theguardian.com/environment/2021/jul/26/blue-ticked-off-the-controversy-over-the-msc-fish-ecolabel (last visited July 7, 2023).

97. Gerry Leape, an Ocean Specialist at the Pew Environment Group, supported the MSC for more than a decade as a member of its advisory Stakeholder Council, but is now concerned, stating, "We would prefer they didn't use the word *sustainable*." He and other critics say that the MSC system has been certifying fisheries despite evidence that the fish stocks are in trouble or that the fishing is harming the environment.[92]

98. Daniel Paulie, a fisheries professor at the University of British Columbia, helped create the MSC, but now feels it is doing business for the industry, not the environment.[93] He has called for a complete ban of open-ocean fishing because it is essential to rebuilding globally depleted fish stocks and preventing the demise of the fishing industry.[94]

99. Jim Barnes, director of the Antarctic and Southern Ocean Coalition, worries the MSC is straying from its mission and needs an overhaul.[95]

100. Chris Pincetich, a marine biologist with the Turtle Island Restoration Network, said, "The MSC has rushed to accept applications from hundreds of fisheries around the globe in order to grow their business and network. Many of those are actually viewed by scientists as unsustainable. They should really take a closer look before they even engage with those fisheries."[96]

---

[92] Daniel Zwerdling & Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?* NPR (Feb 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited July 7, 2023).

[93] *Id.*

[94] Richard Schiffman, *A Global Ban on Fishing on the High Seas? The Time Is Now*, Yale Environment 360 (Sept. 27, 2018), https://e360.yale.edu/features/a-global-ban-on-fishing-on-the-high-seas-the-time-is-now#:~:text=the%20High%20Seas%3F-,The%20Time%20Is%20Now,of%20the%20fishing%20industry%20itself (last visited July 7, 2023).

[95] Daniel Zwerdling & Margot Williams, *supra* n. 92.

[96] Richa Syal, *supra* n. 90.

101.     The MSC is, of course, out to make a profit. It charges retailers royalties starting at 0.5% of the net wholesale value of seafood sold for using its label.[97] Therefore, it naturally follows that the more fish and seafood that the MSC's customers sell, the more money the MSC earns.

102.     The MSC has certified more than 30,000 seafood products globally.[98] Approximately 80% of the organization's income comes from licensing its logo on seafood products.[99] Fisheries that seek certification and the use of the MSC's "ecolabel" pay $20,000 to $100,000 USD.[100]

103.     Despite countless fisheries employing harmful practices that deplete fish populations, destroy habitats, and harm marine life, there have only been a handful that have ever been denied certification in over 20 years.[101]

104.     Professor Callum Roberts, a marine biologist in the Department of Environment and Geography, University of York, and Amy Hammond, Head of Research at Seahorse Environmental Communications, express the perception that "the bar has been dropped unacceptably low in order to satisfy ever-growing market demand by getting more (generally large industrial) fisheries into the program."[102]

---

[97]  Marine Stewardship Council, *Apply to use the MSC label*, https://www.msc.org/for-business/use-the-blue-msc-label/apply (last visited July 7, 2023).

[98] Marine Stewardship Council, *Buy Sustainable Seafood*, https://www.msc.org/what-you-can-do/buy-sustainable-seafood (last visited July 7, 2023).

[99] *SEASPIRACY*, *supra* n. 48.

[100] David Jolly, *Krill Harvest Certification Upsets Conservationists*, The New York Times, August 8, 2022, www.nytimes.com/2010/06/23/science/earth/23krill.html (last visited July 7, 2023).

[101] *SEASPIRACY*, *supra* n. 48.

[102]  Amy Hammond & Callum Roberts, *Why the Marine Stewardship Council Needs an Independent Review*, ETHICAL CONSUMER (July 31, 2019.) https://www.ethicalconsumer.org/food-drink/why-marine-stewardship-council-needs-independent-review (last visited July 7, 2023).

105.    The MSC defines sustainable seafood as seafood that comes from fisheries that catch fish in ways that ensure the long-term health of a stock or species and the wellbeing of the ocean.[103] Individual fishers or vessels cannot be MSC certified—only fishing operations.[104] According to the MSC's website, there are currently more than 400 wild capture fisheries certified to this standard.[105]

106.    MSC's Fishery Standards require:

- "Fishing must be at a level that ensures it can continue indefinitely and the fish population can remain productive and healthy."

- "Fishing activity must be managed carefully so that other species and habitats within the ecosystem remain healthy."

- "[F]isheries must comply with relevant laws and be able to adapt to changing environmental circumstances."

107.    However, the only fishing techniques that disqualify a fishery from MSC certification is if it utilizes fishing with poisons or explosives.[106]

108.    The MSC certifies large scale fisheries—most of which use harmful fishing techniques, such as purse seiners and trawlers—that account for 93% of MSC's certified catch; the remaining 7% of catch comes from small fisheries.[107] The fishing methods used by these fisheries cause overfishing and indiscriminately capture non-target species.

---

[103] Marine Stewardship Council, *What Does the Blue MSC Label Mean?* www.msc.org/what-we-are-doing/our-approach/what-does-the-blue-msc-label-mean (last visited July 7, 2023).

[104] *Id.*

[105] *Id.*

[106] MSC Fishery Assessment Methodology and Guidance to Certification Bodies, p. 10, para. 2.6; Greenpeace, Assessment of the Marine Stewardship Council (MSC) Fisheries Certification Programme. June 2009, https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/planet3/PDFs/assessment-of-the-msc.pdf (last visited July 7, 2023).

[107] Frederic Le Manach et al., *Small is Beautiful, but Large is Certified: A Comparison between Fisheries the Marine Stewardship Council (MSC) Features in its Promotional Materials and MSC-*

109.    The MSC recently certified a Russian pollock fishery notwithstanding its refusal to cooperate with certain conditions, including efforts to minimize lethal impacts of the fishery on endangered species, providing data on the impacts to endangered species, and minimizing impacts on habitats.[108]

110.    MSC-certified Russian fisheries in the Bering Sea lack scientific observer coverage and a comprehensive strategy to ensure endangered species, such as the Steller sea lion and albatross, are being protected.[109]

111.    ConAgra knows or should know that MSC violates its own fishery standards as well as ConAgra's Corporate Social Responsibility standards and ConAgra's Code of Conduct for Suppliers. The fisheries that supply ConAgra with pollock from the Bering Sea do not consider long term health of fish populations, do not consider the health of other species, and do not consider the protection of ecosystems. Furthermore, the MSC does not take changing environmental circumstances into account.

112.    In purchasing ConAgra's Products with the Sustainability Promise, reasonable consumers expect that ConAgra would maintain the proper, company-wide monitoring to follow the explicit promises it makes regarding the alleged sustainable fishing practices used to source the Products. ConAgra's failure to investigate its suppliers and use of the MSC certification despite

*Certified Fisheries,* (May 4, 2020); Marine Stewardship Council, *Fishing Methods and Gear Types*, https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types (last visited July 7, 2023).

[108] Ivan Stupachenko, *Russia Nets Two New MSC Certifications for Shrimp and Pollock*, Seafood Source (Sept. 9, 2021), https://www.seafoodsource.com/news/environment-sustainability/russia-nets-two-new-msc-certifications-for-shrimp-and-pollock (last visited July 7, 2023).

[109] MSC Fisheries Assessments, Fishery Shipowners Association (FSA) Western Bering Sea Walleye Pollock, *supra* n. 41; MSC Fisheries Assessments, Western Bering Sea Pollock Public Certification Report, *supra* n. 36.

the fisheries' blatant unsustainable practices violates the explicit Sustainability Promises ConAgra makes to consumers.

113.    ConAgra had an obligation to consumers to ensure that its prominent Sustainability Promise followed a reasonable consumer's expectation of sustainable seafood. Certainly, ConAgra knew it could not uphold that promise because it admits to using large scale fishing methods, including pelagic trawls employed by MSC fisheries, that indisputably harm the oceans and marine life. As described herein, no reasonable consumer would deem these fishing practices sustainable due to the severe harm they cause to snow crab populations, endangered marine mammals, seabirds, and marine ecosystems.

## IV.    Plaintiffs and Class Members Relied Upon ConAgra's Deceptive Sustainability Promise in their Purchase of the Products at a Premium.

114.    ConAgra's Sustainability Promise deceives and/or is likely to deceive the public. Reasonable consumers have been, and continue to be, deceived into believing that ConAgra's Products are sourced using sustainable fishing practices. Moreover, reasonable consumers have been, and continue to be, deceived into believing that ConAgra's Products are sourced in compliance with ConAgra's Corporate Social Responsibility campaign, MSC's Fishery Standards, and other requirements.

115.    Consumers are unable to discover the true nature of ConAgra's Products from the Products' packaging. Ordinary consumers do not have sufficient knowledge about the commercial fishing industry to know or ascertain that ConAgra's Products are sourced using unsustainable practices that effectively destroy marine ecosystems and deplete fish stocks. Likewise, ordinary consumers do not have sufficient knowledge about ConAgra's practices to know or ascertain whether ConAgra actually complies with ConAgra's Corporate Social Responsibility campaign, MSC's Fishery Standards, and other requirements.

116.    ConAgra knew or should have known that its Products are not sourced sustainably. In making false, deceptive, and misleading representations, ConAgra intended to deceive reasonable consumers into buying and/or paying more for products marketed with a Sustainability Promise.

117.    ConAgra's material misrepresentations and omissions set forth in this Amended Complaint were disseminated uniformly to Plaintiffs and all Class Members through product packaging and labeling, exposing Plaintiffs and all Class Members to ConAgra's false, deceptive, and misleading advertising and unfair, unlawful, and fraudulent business practices.

118.    When purchasing ConAgra's Products, Plaintiffs relied upon ConAgra's misrepresentations and omissions. Had ConAgra not made a Sustainability Promise that was false, deceptive, and misleading, reasonable consumers would not have been willing to pay a price premium for the Products or would not have purchased the Products at all.

119.    Plaintiffs were injured at the time of purchase as they would not have paid a premium price or purchased ConAgra's Products had ConAgra made truthful advertising statements and disclosed material information concerning the fishing practices involved with its Products, including its failure to comply with ConAgra's Corporate Social Responsibility campaign, MSC's Fishery Standards, and the supported use of its Blue Tick.

120.    ConAgra's material misrepresentations and omissions set forth in this Amended Complaint induced Plaintiffs into purchasing ConAgra's Products, resulting in remittance from Plaintiffs to the benefit of ConAgra. Had ConAgra advertised its Products truthfully, Plaintiffs would not have paid ConAgra for its Products.

121.     Plaintiffs and Class Members have been, and will continue to be deceived or misled, by ConAgra's false and misleading misrepresentations and omissions concerning the fishing practices used to source its Products.

122.     Plaintiffs and Class Members are reasonable consumers who have been injured by purchasing ConAgra's Products. Because of ConAgra's material misrepresentations and omissions in its statements and advertisements concerning its Products, including on product packaging and labeling, Plaintiffs and Class Members were harmed at the time of purchase.

123.     ConAgra's misrepresentations and omissions were a material factor in influencing Plaintiffs' and Class Members' decision to purchase ConAgra's Products.

124.     ConAgra's conduct has injured Plaintiffs and Class Members because ConAgra's Products are not sustainably sourced, and do not comply with ConAgra's Corporate Social Responsibility or MSC's own standards. Rather, the fishing practices of ConAgra's suppliers are known to be destructive, and ConAgra failed to conspicuously disclose this reality to Plaintiffs and Class Members.

125.     ConAgra continues to engage in the unlawful acts and practices set forth in this Amended Complaint.

126.     Unless enjoined, ConAgra's unlawful acts and practices described in this Amended Complaint will continue.

## CLASS ACTION ALLEGATIONS

127.     Plaintiffs bring this matter on behalf of themselves and those similarly situated. As detailed at length in this Complaint, ConAgra orchestrated deceptive marketing, advertisement, and labeling practices. ConAgra's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Amended Complaint is uniquely situated for class-wide resolution.

128.    Plaintiffs Bohen and Nasser bring this action as a class action pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 23 on behalf of themselves and all others similarly situated as members. The Nationwide Class is defined as:

> **All persons who purchased in the United States any of the Seafood Products, within the applicable statute of limitations, until the date notice is disseminated.**

129.    Plaintiffs Bohen and Nasser bring this action as a class action individually and all others similarly situated. The Multi-State Consumer Protection Class is defined as:

> **All persons who purchased in the State of Illinois or any state with similar laws[110] any of the Seafood Products, within the applicable statute of limitations, until the date notice is disseminated.**

130.    Plaintiffs Bohen and Nasser also seek certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of Illinois at any time during the Class Period (the "Illinois Subclass") as follows:

> **All persons who purchased in the State of Illinois any of the Seafood Products, within the applicable statute of limitations, until the date notice is disseminated.**

---

[110] While discovery may alter the following, Plaintiffs assert that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Illinois (815 ICLS §§ 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

131.    Plaintiff Bohen also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of California at any time during the Class Period (the "California Subclass") as follows:

**All persons who purchased in the State of California any of the Seafood Products, within the applicable statute of limitations, until the date notice is disseminated.**

132.    Plaintiff Nasser also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of Virginia at any time during the Class Period (the "Virginia Subclass") as follows:

**All persons who purchased in the State of Virginia any of the Seafood Products, within the applicable statute of limitations, until the date notice is disseminated.**

133.    The Nationwide Class, Multi-State Consumer Protection Class, and Illinois, California, and Virginia Subclasses are referred to collectively throughout the Amended Complaint as the Class, and the members of the Classes are referred to as the "Class Members." Specifically excluded from the Classes are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the class definitions as necessary.

134.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

135. **Numerosity**: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers who are Class Members that have been damaged by ConAgra's deceptive and misleading practices.

136. **Commonality**: The questions of law and fact common to the Class Members, which predominate over any questions that may affect individual Class Members include, but are not limited to:

      (a)    Whether ConAgra is responsible for the conduct alleged herein, which was uniformly directed at all consumers who purchased the Seafood Products;

      (b)    Whether ConAgra's misconduct set forth in this Amended Complaint demonstrates that ConAgra has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Seafood Products;

      (c)    Whether ConAgra made false and/or misleading statements to the Class and the public concerning the contents of its Seafood Products;

      (d)    Whether ConAgra's false and misleading statements concerning its Seafood Products were likely to deceive the public;

      (e)    Whether Plaintiffs and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members and, if so, the amount of such damages or restitution;

      (f)    Whether injunctive relief is appropriate under the circumstances; and

      (g)    Whether Plaintiffs and other Class Members are entitled to declaratory or other equitable relief.

137. **Typicality**: Plaintiffs are members of the Classes. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased ConAgra's Products. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

138. **Adequacy**: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent; their consumer Protection claims are common to all members of the Classes and they have a strong interest in vindicating their rights; they have retained counsel that is competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.

139. **Predominance**: Pursuant to rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Classes. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on ConAgra's deceptive and misleading marketing and labeling practices.

140. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    (a)    The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    (b)    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

(c)    When ConAgra's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

(d)    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

(e)    Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

(f)    This class action will assure uniformity of decisions among Class Members;

(g)    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

(h)    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

(i)    It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by ConAgra's uniform false marketing and advertising to purchase its Products as being good for the planet and eco-friendly.

141.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE ILLINOIS
### CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT
#### (By Plaintiffs on Behalf of the Illinois Subclass)

142.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

143.    Plaintiffs bring this action individually and on behalf of the Illinois Subclass.

144.    In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill.

Comp. Stat. 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts

or practices, including but not limited to the use or employment of any deception, fraud, false

pretense, false promise, misrepresentation or the concealment, suppression or omission of any

material fact, with intent that others rely upon the concealment, suppression or omission of such

material fact or the use or employment of any practice described in Section 2 of the 'Uniform

Deceptive Trade Practices Act' . . . ."

145.    Plaintiffs and the Illinois Subclass Members were injured by ConAgra's deceptive

misrepresentations, concealments and omissions and these misrepresentations, concealments and

omissions were material and deceived Plaintiffs and the Class. Because Plaintiffs Bohen and

Nasser and the Illinois Subclass Members relied on ConAgra's misrepresentations, concealments

and omissions when purchasing ConAgra's Products, they were injured at the time of purchase.

146.    ConAgra does business in Illinois, sells and distributes its Seafood Products in

Illinois, and engaged in deceptive acts and practices in connection with the sale of the Seafood

Products in Illinois and elsewhere in the United States.

147.    The Seafood Products purchased by Plaintiffs Bohen and Nasser and the Illinois

Subclass Members were "consumer items" as that term is defined under the Illinois Consumer

Fraud Act.

148.     ConAgra engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to ConAgra as set forth above concerning its Products, which has caused damage and injury to Plaintiffs Bohen and Nasser and the Illinois Subclass Members. Plaintiffs Bohen and Nasser and the Illinois Subclass Members were injured by ConAgra's unfair and deceptive acts at the time of purchasing ConAgra's Seafood Products.

149.     ConAgra represented, directly or indirectly, that its Seafood Products were "sustainable" when, in reality, they are not.

150.     ConAgra failed to disclose in its advertising statements the material fact that despite the uniform "sustainable" representations on the packaging of the Seafood Products, that they were, in fact, not "sustainable."

151.     ConAgra knew or should have known that its Sustainability Promise, including the sustainability representations on the front of the Seafood Product Packaging, were false and misleading, and that by omitting and failing to disclose the truth in its advertising, it omitted material facts that would alter any reasonable consumer's decision to purchase the Products.

152.     ConAgra's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

153.     ConAgra intended Plaintiffs Bohen and Nasser and the Illinois Subclass Members to rely on its deceptive acts when purchasing ConAgra's Products.

154.     ConAgra's deceptive acts proximately caused actual injury and damage to Plaintiffs Bohen and Nasser and the Illinois Subclass Members at the time of purchase.

155.    Plaintiffs Bohen and Nasser and the Illinois Subclass Members would not have purchased, or would have paid less for, ConAgra's Products but for ConAgra's material misrepresentations as described in this Complaint.

**COUNT TWO**
**VIOLATION OF THE ILLINOIS**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiffs on Behalf of the Illinois Subclass)**

156.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

157.    Plaintiffs bring this action individually and on behalf of the Illinois Subclass.

158.    The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

159.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

160.    ConAgra engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to ConAgra as set forth above concerning its Seafood Products, which have caused damage and injury to Plaintiffs Bohen and Nasser and the Illinois Subclass Members.

Plaintiffs Bohen and Nasser and the Illinois Subclass Members were injured by ConAgra's unfair and deceptive conduct at the time of purchasing ConAgra's Products.

161.    With its Sustainability Promise, including the "certified sustainably sourced" representations on the front of the Seafood Product Packing, ConAgra represented, directly or indirectly, that its Products were "sustainable," when, in reality, they are not.

162.    ConAgra failed to disclose in its advertising statements the material fact that the Products are not "sustainable."

163.    ConAgra knew or should have known that its "sustainable" representations were false and misleading, and that by omitting and failing to disclose the truth in its advertising, it omitted material facts that would alter any reasonable consumer's decision to purchase the Products.

164.    ConAgra's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

165.    ConAgra's deceptive acts proximately caused actual injury and damage to Plaintiffs Bohen and Nasser and the Illinois Subclass Members at the time of purchase.

166.    Plaintiffs Bohen and Nasser and the Illinois Subclass Members would not have purchased, or would have paid less for, ConAgra's Products but for ConAgra's material misrepresentations as described in this Complaint.

167.    ConAgra intended Plaintiffs Bohen and Nasser and the Illinois Subclass Members to rely on its deceptive acts when purchasing the Products.

**COUNT THREE**
**VIOLATION OF THE CALIFORNIA**
**CONSUMERS LEGAL REMEDIES ACT**
**("CLRA"), Civil Code §§ 1750, *et seq.***
**(By Plaintiff Bohen on Behalf of the California Subclass)**

168.     Plaintiff Bohen incorporates the preceding paragraphs as if fully set forth herein.

169.     Plaintiff Bohen brings this action individually and on behalf of the California Subclass.

170.     The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

171.     The CLRA applies to all claims of all California Subclass Members because the conduct which constitutes violations of the CLRA by ConAgra occurred within the State of California.

172.     Plaintiff Bohen and California Subclass Members are "consumers" as defined by Civil Code § 1761(d).

173.     ConAgra is a "person" as defined by Civil Code § 1761(c).

174.     The Products qualify as "goods" as defined by Civil Code § 1761(a).

175.     Plaintiff Bohen and California Subclass Members' purchases of the Seafood Products are "transactions" as defined by Civil Code § 1761(e).

176.     As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

- "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

- "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

- "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

- "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

177.    ConAgra engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Seafood Products had benefits or characteristics (through the Sustainability Promise, including the "certified sustainably sourced" representations on the front of the Product labels) that they did not actually have.

178.    As detailed in the body of this Complaint, ConAgra has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding Products benefits or characteristics that they did not in fact have and represented the Products to be of a quality that was not true. Indeed, ConAgra concealed this information from Plaintiff Bohen and California Subclass Members.

179.    ConAgra represented, directly or indirectly, that its Products were "sustainable" when, in reality, they are not.

180.    ConAgra failed to disclose in its advertising statements the material fact that despite the uniform "sustainable" representations on the packaging of the Products, that they were, in fact, not "sustainable."

181.    ConAgra knew or should have known that its Sustainability Promise, including the "certified sustainably sourced" representations on the Product packaging were false and

misleading, and that by omitting and failing to disclose the truth in its advertising, it omitted material facts that would alter any reasonable consumer's decision to purchase the Products.

182.    ConAgra's deceptive acts occurred in a course of conduct involving trade and commerce in California and throughout the United States.

183.    ConAgra intended Plaintiff Bohen and California Subclass Members to rely on its deceptive acts when purchasing ConAgra's Products.

184.    ConAgra's deceptive acts proximately caused actual injury and damage to Plaintiff Bohen and California Subclass Members at the time of purchase.

185.    Plaintiff Bohen and California Subclass Members would not have purchased, or would have paid less for, ConAgra's Products but for ConAgra's material misrepresentations as described in this Amended Complaint.

186.    ConAgra engaged in uniform marketing efforts to reach California Subclass Members, their agents, and/or third parties upon whom it relied, to persuade them to purchase the Products. ConAgra's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the "sustainability" of the Products.

187.    Despite these misrepresentations, ConAgra also omitted and concealed information and material facts from Plaintiff Bohen and California Subclass Members.

188.    In their purchase of Products, Plaintiff Bohen and California Subclass Members relied on ConAgra's representations and omissions of material facts.

189.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

190.     Pursuant to Cal. Civ. Code § 1782, Plaintiff Bohen notified ConAgra in writing by certified mail sent on March 2, 2023, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above and give notice to all affected consumer of ConAgra's intent to do so. ConAgra has not agreed to rectify the problems identified nor to give notice to all affected consumers. As such, in accordance with Civil Code § 1780(a), Plaintiff Bohen and California Subclass Members now seek injunctive relief to enjoin ConAgra from continuing its deceptive advertising and sales practices, and equitable relief, including but not limited to actual, punitive and statutory damages, for ConAgra's violations of the CLRA.

191.     A declaration establishing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(d) was attached to the original Complaint as Exhibit A, *see* ECF No. 1-1.

192.     Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff Bohen and California Class Members also seek a declaration that Defendant's conduct violates the Consumer Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

## COUNT FOUR
## VIOLATION OF THE CALIFORNIA
## UNFAIR COMPETITION LAW
### ("UCL"), California Business and Professions Code §§ 17200, *et seq.*
### (Plaintiff Bohen on Behalf of the California Subclass)

193.     Plaintiff Bohen incorporates the preceding paragraphs as if fully set forth herein.

194.     Plaintiff Bohen brings this action individually and on behalf of the California Subclass.

195.     ConAgra is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

196.     Plaintiff Bohen and California Subclass Members who purchased ConAgra's Products suffered an injury by virtue of buying products in which ConAgra misrepresented and/or

omitted the Products' true quality, reliability, safety, and use. Had Plaintiff Bohen and California Subclass Members known that ConAgra materially misrepresented the Products and/or omitted material information regarding its Products, they would not have purchased the Products.

197.    ConAgra's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this Amended Complaint.

198.    There is no benefit to consumers or competition by allowing ConAgra to deceptively label, market, and advertise its Products.

199.    Plaintiff Bohen and California Subclass Members who purchased ConAgra's Products had no way of reasonably knowing that the Products were deceptively packaged, marketed, advertised, and labeled. Thus, Plaintiff Bohen and California Subclass Members could not have reasonably avoided the harm they suffered.

200.    Specifically, ConAgra marketed, labeled, and represented the Products with the Sustainability Promise, including with the "certified sustainably sourced" representations on the front of the product packaging, when in fact the Products are not sustainably sourced.

201.    The gravity of the harm suffered by Plaintiff Bohen and California Subclass Members who purchased ConAgra's Products outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Products in a deceptive and misleading manner. Accordingly, ConAgra's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff Bohen and California Subclass Members.

202.    The above acts of ConAgra in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Bohen and California Subclass Members, were and are likely to deceive reasonable consumers by obfuscating

the true nature of ConAgra's Products, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

203.     As a result of ConAgra's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seek injunctive relief prohibiting ConAgra from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from ConAgra's wrongful conduct to the fullest extent permitted by law.

**COUNT FIVE**
**VIOLATION OF THE CALIFORNIA**
**FALSE ADVERTISING LAW**
**("FAL"), California Business and Professions Code §§ 17500, *et seq*.**
**(By Plaintiff Bohen on Behalf of the California Subclass)**

204.     Plaintiff Bohen incorporates the preceding paragraphs as if fully set forth herein.

205.     Plaintiff Bohen brings this action individually and on behalf of the California Subclass.

206.     The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

207.     The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

208.    Specifically, ConAgra marketed, labeled, and represented with the Sustainability Promise, including with the "certified sustainably sourced" representations on the front of the product packaging, when in fact they are not sustainably sourced.

209.    ConAgra's failure to ensure that the Sustainability Promise was, in fact, truthful is a violation of the explicit promises that it made to consumers on each and every Product label. Consumers expected that ConAgra would have the proper, company-wide monitoring in place to confirm the explicit promise it made to consumers regarding the sustainability of the fishing practices used to source the Products. Instead, ConAgra failed to ensure that the fisheries only sourced using sustainable means, making its promises meaningless.

210.    ConAgra was either aware that Products were not caught using sustainable fishing practices consistent with the Sustainability Promise, including with the "certified sustainably sourced" representations on the front of the product packaging, or should have known that it lacked the information and/or knowledge required to make such a representation truthfully. ConAgra concealed and omitted and failed to disclose this information to Plaintiff Bohen and California Subclass Members.

211.    ConAgra's descriptions of the Seafood Products were false, misleading, and likely to deceive Plaintiff Bohen and California Subclass Members and other reasonable consumers.

212.    ConAgra's conduct therefore constitutes deceptive or misleading advertising.

213.    Plaintiffs have standing to pursue claims under the FAL as they reviewed and relied on ConAgra's packaging, advertising, representations, and marketing materials regarding the Products when selecting and purchasing the Products.

214.    In reliance on the statements made in ConAgra's advertising and marketing materials and ConAgra's omissions and concealment of material facts regarding the sustainability of the Products, Plaintiff Bohen and California Subclass Members purchased the Products.

215.    Had ConAgra disclosed the true nature of the Products (that they were not sustainable), Plaintiff Bohen and California Subclass Members would not have purchased Products or would have paid substantially less for them.

216.    As a direct and proximate result of ConAgra's actions, as set forth herein, ConAgra has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Bohen and California Subclass Members who paid for the Products, which were not sustainable.

217.    Plaintiff Bohen and California Subclass Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by ConAgra and by means of its deceptive or misleading representations, including monies already obtained from Plaintiff Bohen and California Subclass Members as provided for by the California Business and Professions Code § 17500.

### COUNT SIX
### VIOLATION OF THE VIRGINIA
### CONSUMER PROTECTION ACT OF 1977
### (By Plaintiff Nasser on Behalf of the Virginia Subclass)

218.    Plaintiff Nasser incorporates the preceding paragraphs as if fully set forth herein.

219.    Plaintiff Nasser brings this action individually and on behalf of the Virginia Subclass.

220.    Plaintiff Nasser brings this claim on behalf of the Virginia Subclass against ConAgra for violation of the Virginia Consumer Protection Act of 1977, Va. Code Ann. §§ 59.1-196, *et seq*.

221.    ConAgra is a "supplier," as defined by Virginia Code section 59.1-198.

222.     ConAgra engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods," as defined by Virginia Code section 59.1-198. ConAgra advertised, offered, or sold goods used primarily for personal, family or household purposes.

223.     Under the Virginia Consumer Protection Act of 1977:

The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

. . .

5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

. . .

8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.

. . . [and]

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction . . . .

Va. Code Ann. § 59.1-200(A)(5), (6), (8), (14).

224.     ConAgra engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation, including, but not limited to, its Sustainability Promise, including with the "certified sustainably sourced" representations on the front of the product packaging, as described herein, in violation of each of the provisions set forth in the preceding paragraph.

225.     ConAgra's representations and omissions were material because they were likely to deceive reasonable consumers.

226.     ConAgra made the misrepresentations because consumers purchased the particular Products given the representations made about the sustainability of the Products. But ConAgra

made these representations without any mechanism in place—or intention to develop such mechanism—to ensure that those practices were being followed as described to Plaintiff Nasser and the Virginia Subclass.

227.     As a direct and proximate result of ConAgra's deceptive acts and practices, Plaintiff Nasser and the Virginia Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

228.     ConAgra's violations present a continuing risk of injury to Plaintiff Nasser and the Virginia Subclass, as well as to the general public.

229.     Plaintiff Nasser and the Virginia Subclass seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

230.     Therefore, Plaintiffs pray for relief as set forth below.

**COUNT SEVEN**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
**(By Plaintiffs Bohen and Nasser on Behalf of the Multi-State Consumer Class)**

231.     Plaintiffs Bohen and Nasser incorporate the preceding paragraphs as if fully set forth herein.

232.     Plaintiffs Bohen and Nasser bring this action individually and on behalf of the Multi-State Consumer Class.

233.     Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members have been injured as a result of ConAgra's violations of the state consumer protection statutes listed above in paragraph 129 and footnote 110, which also provide a basis for redress to Plaintiffs Bohen and

Nasser and Multi-State Consumer Class Members based on ConAgra's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

234.    ConAgra's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

235.    ConAgra violated the Multi-State Consumer Class states' unfair and deceptive acts and practices laws with the Sustainability Promise, including with the "certified sustainably sourced" representations on the front of the product packaging, when, in reality, the Seafood Products are not sustainably sourced.

236.    ConAgra's misrepresentations were material to Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members' decision to purchase the Products or pay a premium for the Products.

237.    ConAgra made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

238.    As a result of ConAgra's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members paid a premium for the Products.

239.    As a result of ConAgra's violations, ConAgra has been unjustly enriched.

240.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiffs Bohen and Nasser and Multi-State Consumer Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT EIGHT**
**UNJUST ENRICHMENT/QUASI-CONTRACT**
**(By Plaintiffs Bohen and Nasser on Behalf of the Nationwide Class, or in the Alternative,**
**on Behalf of the California, Virginia, and Illinois Subclasses, Respectively)**

241.     Plaintiffs Bohen and Nasser incorporate the preceding paragraphs as if fully set forth herein.

242.     Plaintiffs Bohen and Nasser bring this action individually and on behalf of the Nationwide Class, or in the alternative, on behalf of the California, Virginia, and Illinois Subclasses, respectively.

243.     ConAgra's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint. ConAgra's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm. While Plaintiffs Bohen and Nasser and Nationwide Class Members were harmed at the time of purchase, ConAgra was unjustly enriched by its misrepresentations and omissions.

244.     Plaintiffs Bohen and Nasser and Nationwide Class Members were harmed when purchasing ConAgra's Products as a result of ConAgra's material representations and omissions, as described in this Complaint. Each Plaintiffs Bohen and Nasser and Nationwide Class Members purchased ConAgra's Products. Plaintiffs Bohen and Nasser and Nationwide Class Members have suffered injury in fact and lost money as a result of paying a premium price for the Products and by purchasing the Products at all, and as a result of ConAgra's unlawful, unfair, and fraudulent business practices.

245.     ConAgra's conduct allows ConAgra to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment of, Plaintiffs Bohen and Nasser

and Nationwide Class Members, and to ConAgra's benefit and enrichment. ConAgra's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

246.    Plaintiffs Bohen and Nasser and Nationwide Class Members confer significant financial benefits and pay substantial compensation to ConAgra for its Products, which are not as ConAgra represent them to be.

247.    Under common law principles of unjust enrichment and quasi-contract, it is inequitable for ConAgra to retain the benefits conferred by Plaintiffs Bohen's and Nasser's and Nationwide Class Members' overpayments.

248.    Plaintiffs Bohen and Nasser and Nationwide Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs Bohen and Nasser and Nationwide Class Members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Bohen and Nasser, on behalf of themselves and the Class, pray for judgment as follows:

1.    Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding monetary damages, including treble damages and statutory damages;

3.    Awarding punitive damages;

4.    Providing for any and all injunctive relief the Court deems appropriate;

5.    Awarding Plaintiffs pre-judgment interest and post-judgment interest, to the extent permitted by law;

6.     Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts, and reimbursement of Plaintiffs' expenses; and

7.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


DATED:  July 7, 2023                        **PEARSON WARSHAW, LLP**


By:  _____*/s/ Melissa S. Weiner*_____
                MELISSA S. WEINER

MELISSA S. WEINER
 mweiner@pwfirm.com
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone:   (612) 389-0600
Facsimile:   (612) 389-0610

DANIEL L. WARSHAW*
 dwarshaw@pwfirm.com
MICHAEL H. PEARSON
 mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

GARY M. KLINGER
gklinger@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878

RACHEL L. SOFFIN*
rsoffin@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: (865) 247-0080

HARPER T. SEGUI*
hsegui@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
825 Lowcountry Boulevard, Suite 101
Mt. Pleasant, South Carolina 29464

ARI KRESCH*
akresch@1800lawfirm.com
WENDY KERNER
wkerner@1800lawfirm.com
**KRESCH LEGAL SERVICES PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Telephone: (800) 529-3476

* *Pro Hac Vice* Forthcoming

*Attorneys for Plaintiffs and the Proposed Class*