**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN BOHEN AND ABDALLAH NASSER, individually and on behalf of all others similarly situated, | ) ) ) | No. 23 C 1298 |
| | ) | |
| *Plaintiffs*, | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| CONAGRA BRANDS, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

As ocean temperatures rise and the planet warms, consumers are evaluating how their purchasing decisions impact the environment. John Bohen and Abdallah Nasser (collectively, Plaintiffs) are two such eco-conscious consumers who paid a premium for ConAgra Brands, Inc.'s products because they believed, based off the packaging, that the company sourced its fish from sustainable fishing practices that protected the marine ecosystem. Much to their dismay, Plaintiffs discovered the opposite to be true. They bring this proposed class action against ConAgra, alleging violations under Illinois, California, Virginia, and other states' consumer protection laws for providing false or misleading advertisement to consumers. (Dkt. 27). Plaintiffs also bring an unjust enrichment claim.

ConAgra now moves to dismiss the claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 30). ConAgra argues that Plaintiffs lack standing and that their packaging is not misleading to a reasonable consumer. For the following reasons, ConAgra's motion to dismiss [30] is granted in part and denied in part.

1

## BACKGROUND

More than ever, consumers are buying sustainable seafood, "harvested in a way that reduces impact on the fish population or the marine environment." (Dkt. 27 ¶¶ 27–28). Like any sophisticated company, ConAgra seeks to paint itself as an eco-friendly and sustainable food manufacturer to tap into the eco-conscious market. (*Id.* at ¶ 29). ConAgra has made several statements in seafood-consumer panel discussions, interviews with their corporate executives, and company marketing literature to craft an environmentally and socially responsible brand. (*See id.* at ¶¶ 24, 29–32, 35–37, 72, 77–79). As part of the advertisement, ConAgra works with Marine Stewardship Council (MSC), a non-profit organization that certifies fisheries who meet its standards of sustainable and marine-friendly fishing practices. (*Id.* at ¶ 5). ConAgra receives its fish from MSC-certified fisheries and that certification is reflected in a Blue Tick label, with the phrase "Certified Sustainable Seafood MSC," presented at the front and back of the packaging. (*Id.* at ¶ 38). The phrase "Certified Sustainably Sourced" is also at the front of the packaging. (*See* Dkt. 31-1 at 18–19). On the back, it says, "Good for the Environment" and "We have full traceability of all our fish." (*Id.*) These representations are made across all nine fish products at issue here.[1]

---

[1] Plaintiffs bring this class action against nine ConAgra products: Mrs. Paul's Crispy Battered Fillets, Crunchy Breaded Fillets, Fish Sticks, Fish Fingers, and Beer Battered Fillets and Van De Kamp's Crispy Battered Fillets, Crunchy Breaded Fillets, Fish Sticks, and Beer Battered Fillets. (Dkt. 27 ¶ 2 n.1).



(Dkt. 31-1 at 2–3, 18–19).

But, according to Plaintiffs, ConAgra's fish is unsustainably sourced: MSC-certified fisheries use "harmful fishing techniques that injure marine wildlife and the marine ecosystem" and ConAgra "lack[s] the traceability and supply chain transparency required to make such sustainability claims." (Dkt. 27 ¶ 39). The fish in ConAgra's products is pollock and they are sourced in the Bering Sea by MSC-certified Russian fisheries who use pelagic midwater trawls. (*Id.* at ¶ 41). A pelagic trawl is a non-selective method of catching fish that uses a large conical net about the size of two football fields. (*Id.* at ¶¶ 47–48). And when dragged through the water, it indiscriminately captures everything within its path, including trapping and killing endangered species like steller sea lions, albatross, and snow crabs. (*Id.* at ¶¶ 46, 48, 53). The Russian fisheries do not have an effective measure to protect these endangered species. (*Id.* at ¶ 53). They also trap and kill a significant number of juvenile pollock, which prevents the establishment of a healthy

3

pollock population. (*Id.* at ¶ 41). ConAgra's pollock suppliers are also not required to mitigate ghost gears—abandoned or discarded fishing gears that create safety hazards for the marine animals. (*Id.* at ¶ 59). Lastly, ConAgra lacks traceability, defined as "the ability to identify the origin of the product and sources of input materials, as well as the ability to conduct backward and forward tracking using recorded information to determine the specific location and history of the product." (*Id.* at ¶ 62). Considering ConAgra's sustainability branding, Plaintiffs argue that ConAgra cannot have 100% traceability because it either knows or should know that its MSC-certified fisheries are practicing unsustainable fishing practices. (*Id.* at ¶¶ 63, 77–79). As part of the traceability problem, ConAgra lacks the criteria to ensure neutral observers can report on the fishing practices used by the fisheries. (*Id.* at ¶ 65).

Plaintiff John Bohen, a California resident, and Abdallah Nasser, a Virginia resident, relied on the packaging representations and believed that the fish was sourced in a way that "would not harm the marine ecosystem and promote marine health." (*Id.* at ¶¶ 20–21). They paid a premium for three ConAgra products: Mrs. Paul's Crunchy Breaded Fillets, Van de Kamp's Fish Sticks, and Van de Kamp's Crispy Battered Fillets. (*Id.*) Absent ConAgra's alleged misrepresentations, Plaintiffs would not have paid the price premium for the products or would not have purchased them at all. (*Id.* at ¶ 118).

On July 7, 2023, Plaintiffs filed an amended class action complaint alleging that ConAgra's packaging is fraudulent, misleading, and deceptive under the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.*, Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, *et seq.*, California Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, Virginia Consumer Protection Act of

1977, Va. Code Ann. § 59.1-196, *et seq.*, and various state consumer protection laws. (*Id.* at ¶¶ 142–240). Plaintiffs also seek to certify a multi-state consumer class. (*Id.* at ¶¶ 231–240).

## LEGAL STANDARD

### I.     Standing under Rule 12(b)(1)

"Standing is an essential component of Article III's case-or-controversy requirement." *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To satisfy standing, Plaintiffs must show that they have "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). The injury must also be "fairly traceable to the challenged action of the defendant," and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (cleaned up). "A district court, in ruling upon an issue of subject matter jurisdiction, must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Kelly v. Med-1 Solutions, LLC*, 548 F.3d 600, 604 (7th Cir. 2008) (citing *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993)).

### II.     Adequacy of Claim under Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting

*Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in Plaintiffs' complaint as true, "drawing all reasonable inferences in [their] favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

## DISCUSSION

### I.    Judicial Notice

ConAgra argues that the Court can take judicial notice of several exhibits attached to its motion to dismiss. "A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997)). Alternatively, a court may consider "documents attached to a motion to dismiss…if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)).

The Court will consider Exhibit A because it provides clearer and larger images of the labels and packaging that are central to Plaintiffs' deceptive advertising claims. But the Court declines to consider Exhibits B–H. Exhibits B and C reference the fact that MSC is a non-profit organization, but MSC's corporate entity is not central to Plaintiffs' claims. Exhibits D, E, F, and H reference ConAgra's Citizenship Report, which discusses the company's sustainability and environmental efforts, and MSC's website and certification standards. As discussed further below, Plaintiffs' claims are premised on how a reasonable consumer interprets ConAgra's packaging. Plaintiffs have not alleged sufficient facts to suggest that a consumer is aware of or has relied upon MSC's standards or ConAgra's general marketing reports when making purchasing decisions.

Therefore, Exhibits D, E, F, and H are also not central to Plaintiffs' claims. Lastly, ConAgra relies on Exhibit G, a National Oceanic Atmospheric Administration report, to argue that pelagic trawls can be a sustainable fishing practice. But Plaintiffs dispute that fact. Therefore, the Court declines to take judicial notice of the disputed fact and will not consider Exhibit G.

## II.     Standing

### A.     Article III Standing

Before engaging with the parties' arguments, the Court will resolve an issue that neither party addressed in their briefing: whether Plaintiffs have standing to bring suit for ConAgra products that they did not purchase. Under Article III, a federal court can resolve only "a real controversy with real impact on real persons." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2103 (2019) (Gorsuch, J. concurring). That standard requires a plaintiff to have a "personal stake" in the case. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Here, Plaintiffs bring their Complaint against nine products, but they only bought three: Mrs. Paul's Crunchy Breaded Fillets and Van de Kamp's Fish Sticks and Crispy Battered Fillets. (*See* Dkt. 27 ¶¶ 20–21). While all nine products allegedly have similar packaging, Plaintiffs cannot be injured by products they did not buy. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936 (7th Cir. 2021) (noting that plaintiff lacked standing for a product he did not purchase); *see also Bakopoulos v. Mars Petcare US, Inc.*, 2021 WL 2915215, at *3 (N.D. Ill. July 12, 2021) ("Plaintiffs have no injury-in-fact caused by products that they did not buy, and therefore lack standing with respect to those products."). Therefore, Plaintiffs only have standing for the three purchased ConAgra products.

ConAgra's standing argument is that Plaintiffs' allegations are too speculative to show a particularized or concrete injury. ConAgra characterizes the Complaint as a general attack on the commercial fishing industry rather than a "personal and individual" injury to the Plaintiffs. *See*

*Wallace v. ConAgra Foods Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014). ConAgra states that Plaintiffs have not tied the pollock in their fish products to the challenged fishing practices, like the pelagic trawl. For example, Plaintiffs fails to plead facts about ConAgra's specific suppliers, the fisheries they operate, and whether those suppliers and fisheries violate any sustainability standards.

For support, ConAgra leans on *Wallace v. ConAgra Foods*, where the Eighth Circuit did not find standing to bring suit on allegedly tainted kosher hotdogs because the injury was too speculative. 747 F.3d at 1030. Although the hotdogs were advertised as 100% kosher, the plaintiffs alleged that the kosher inspection process at the slaughterhouses was defective and unreliable and resulted in tainted meat products. *Id.* at 1028. But that injury was too speculative, the *Wallace* court reasoned, because the plaintiffs failed to show that the specific hotdogs that they purchased were non-kosher. *Id.* at 1030. Even if the inspection process was unreliable 70% of the time, it only showed that some or most of the hotdogs were tainted, but not all. *Id.* As the *Wallace* court opined, "it is quite possible ConAgra sold the consumers *exactly what was promised*: a higher quality, kosher meat product." *Id.* at 1031.

But *Wallace*'s reasoning does not undermine Plaintiffs' position because Plaintiffs allege that *all* pollock, not just a percentage, used in ConAgra's products were unsustainably sourced. ConAgra uses pollock for its fish products. It sources its pollock from Russian fisheries that use pelagic trawls. Using pelagic trawls is harmful to the marine environment and unsustainable. Following the syllogism, the entire line of ConAgra's products at issue here is unsustainably sourced. *See, e.g.*, *Rawson v. ALDI, Inc.*, 2022 WL 1556395, at *1, 4 (N.D. Ill. May 17, 2022) (finding no standing issue where plaintiff alleges ALDI "gets its salmon, at least in part" from fish farms with unsustainable farming practices). Thus, drawing all reasonable inferences in Plaintiffs'

favor, whether they pleaded facts about specific fisheries and their operations is irrelevant because the Complaint alleges that all the company's pollock suppliers engage in unsustainable fishing practices. *See, e.g.*, *Richburg v. Conagra Brands, Inc.*, 2023 WL 1818561, at *5 (N.D. Ill. Feb. 8, 2023) ("To establish standing, it is enough that plaintiffs have plausibly alleged that all Redenbacher popping bags…were substantially similar, that the popping bags generally contained PFAS…").

ConAgra's additional support is unpersuasive for the same reason as *Wallace*. The reasoning underlying the cited cases is that a plaintiff does not have standing if only some products are defective. *See, e.g.*, *Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1305 (10th Cir. 2022) (holding that plaintiffs did not have standing because the dog food they purchased was not tainted); *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 2023 WL 3585759, at *3–5 (N.D. Ill. May 22, 2023) (finding no particularized injury where the plaintiffs do not allege that the products they purchased were contaminated); *Phan v. Sargento Foods, Inc.*, 2021 WL 2224260, at *4 (N.D. Cal. June 2, 2021) (noting that plaintiff's allegation of one product containing antibiotics does not mean all products contained antibiotics); *Gaminde v. Lang Pharma Nut., Inc.*, 2019 WL 1338724, at *2–3 (N.D.N.Y. Mar. 25, 2019) (finding an injury speculative because plaintiffs cannot extrapolate that all bottles were defective if the relied-upon study only found two bottles defective).

And contrary to ConAgra's position, Plaintiffs have alleged specific facts to support a concrete economic injury. *See Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing."). Plaintiffs allege that they would not have purchased ConAgra's products, or would not have paid for the premium, had they known the pollock was not sustainably sourced. *See In re Aqua Dots*, 654 F.3d

9

748 at 751 ("The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing."). That is a recognizable injury under Article III. *See, e.g., Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) (noting that courts have recognized an injury "where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect"); *Curtis v. 7-Eleven, Inc.*, 2022 WL 4182384, at *6 (N.D. Ill. Sept. 13, 2022) ("An act that lightens the pocketbook gives rise to standing, because a loss of money is an injury.").

ConAgra finally contends that Plaintiffs cannot show a concrete economic injury because their interpretation of the packaging is fanciful and unreliable. ConAgra makes a substantive argument regarding the merits of Plaintiffs' claims, but it is a separate issue from standing, which determines whether this Court can even hear the merits. "Plaintiffs have standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102–04 (1998)). Plaintiffs allege that they were victims of ConAgra's deceptive advertising, and the Court can redress the injury. "Nothing more is required for standing." *Id.* As ConAgra's argument goes to the merits, it is addressed in the next section. *See, e.g., Askin v. Quaker Oats Co.*, 818 F. Supp. 2d 1081, 1086 (N.D. Ill. 2011).

### B.     Injunctive Relief

While Plaintiffs can pursue monetary damages, their arguments fall short in asserting standing for injunctive relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). To have standing for injunctive relief, Plaintiffs must show that they face a "real and

immediate threat of *future* injury" from ConAgra's actions. *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (cleaned up) (emphasis added).

Here, Plaintiffs have not alleged that they themselves are at risk of future harm from ConAgra's deceptive advertisements. They are now aware that ConAgra's pollock is unsustainably sourced. Therefore, any future harm is too speculative to support standing for injunctive relief. Conceding this point, Plaintiffs counter that other consumers would be deceived by ConAgra's deceptive practices. They cite *Le v. Kohls Dep't Stores, Inc.*, where the court found standing for injunctive relief when the complaint is aimed at a "company-wide, pervasive, and continuous false advertising campaign." 160 F. Supp. 3d 1096, 1110 (E.D. Wis. 2016) (cleaned up).

*Le* is neither controlling nor persuasive. As noble as Plaintiffs' concerns are for other consumers, Article III inquiry asks the Court to look at whether Plaintiffs, not other individuals, are facing any future "real or immediate" threat. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (stating "to establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights" (citing *Lyons*, 461 U.S. at 102)); *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("[A] person cannot predicate standing on injury he does not share."). As Plaintiffs have not alleged such dangers, the answer must be no.

Plaintiffs also ask the Court to look at public policy concerns, but that argument is "overstated." *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 858 (N.D. Ill. 2021). Article III only determines whether a plaintiff can bring a case in federal court; it does not impose "the same standing or remedial requirements" in state courts. *Lyons*, 461 U.S. at 113. Plaintiffs are free to pursue injunctive relief at the state level. Moreover, Plaintiffs have not cited any authority to suggest that the Court can "carve out an exception to Article III's standing requirement to further"

11

consumer protection laws. *Bohn v. Boiron*, 2013 WL 3975126, at *3 (N.D. Ill. Aug. 1, 2016); *see also Freeman*, 528 F. Supp. 3d at 858 ("In any event, the bottom line is that public-policy concerns, no matter how compelling, cannot trump the Article III standing requirement."). In sum, the Court dismisses Plaintiffs' claims for injunctive relief.

### C.      Standing as Class Representative for Multi-State Class

Next, ConAgra argues that Bohen and Nasser do not have Article III standing to represent the claims of individuals not within Plaintiffs' own states. Furthermore, ConAgra seeks to dismiss the claims under other states' consumer protection laws because the material conflicts among the state laws would render a multi-state class unmanageable under Federal Rule of Civil Procedure 23.

To start, the Court already established that Plaintiffs have Article III standing—they can bring their claims in federal court. In addition, Plaintiffs seek to serve as class representatives and redress the injuries of other class members. That is the entire purpose of a class action—"to represent the interests of class members, not just the representative's own interests." *Freeman*, 528 F. Supp. 3d at 859. By ConAgra's logic, if a plaintiff can only seek to represent individuals within their own state, there can never be a nationwide or multi-state class action unless there is a representative from each state. *See, e.g.*, *id.* ("That ban would apply even against a products-liability class action based on common-law negligence or strict liability principles, and even if the case involved applying the same legal principles uniformly throughout the Nation.").

The proper framing of ConAgra's contention is whether Plaintiffs can serve as class representatives for a multi-state class, including the proposed Illinois subclass, when they have not purchased ConAgra products in other states. *See, e.g.*, *Halperin v. Int'l Web Servs., LLC*, 123 F. Supp. 3d 999, 1009 (N.D. Ill. 2015) (recharacterizing defendant's standing claim as a Rule 23

challenge). That question is better answered at the class-certification stage, when the Court can evaluate ConAgra's concerns "with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton*, 308 F.3d at 680; *see also Muir v. Nature's Bounty (DE), Inc.*, 2018 WL 3647115, at *7 (N.D. Ill. Aug. 1, 2018) ("[A]s long as the named plaintiffs have [constitutional] standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of 'adjudicatory competence' under Article III." (quoting *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018))).

In the same vein, the Illinois subclass's viability depends on whether the choice-of-law analysis points to a uniform set of laws to apply. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("The district judge, well aware of this principle, recognized that uniform law would be essential to class certification. Because plaintiffs' claims rest on state law, the choice-of-law rules come from the state in which the federal court sits."); *see also Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008), *aff'd*, 612 F.3d 932 (7th Cir. 2010) ("This lack of unison in the case law would be immaterial, however, if the applicable choice-of-law analysis points to only one state's law."). But such analysis does not lend itself to resolution under Rule 12(b). *Morrison*, 549 F.3d at 536–38; *see also Williams v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 4106067, at *22 (N.D. Ill. Jun. 21, 2023).

Therefore, the Court denies ConAgra's motion to dismiss the multi-state class and Illinois subclass claims.

## III. Adequacy of Plaintiffs' Claims

### A. Deceptive Advertising under "Reasonable Consumer" Standard

All of Plaintiffs' deceptive advertising claims rest on the "reasonable consumer" standard. Therefore, Plaintiffs must plead that ConAgra's labels "are likely to deceive reasonable consumers," which "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020) (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972–73 (7th Cir. 2020)). "Consumer-protection laws do not impose on average consumers an obligation to question the labels they see and to parse them as lawyers might for ambiguities, especially in the seconds usually spent picking a low-cost product." *Id.* at 476. When evaluating deceptive advertising claims, the Court "should take into account all the information available to consumers and the context in which that information is provided and used." *Id.* at 477. The question of whether a label is misleading or deceptive often requires a "practical and fact-intensive approach" and is typically not a question that should be decided at the motion-to-dismiss stage. *Id.* at 478–79. But a Court may dismiss the claim at the pleading stage "where plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising." *Id.* at 477–78.

Before discussing the merits, the Court will address Plaintiffs attempt to connect ConAgra's general marketing strategy to the labels on the products' packaging. In their Complaint, Plaintiffs reference several off-label remarks—statements from panel discussions, interviews with corporate officers, and the company's Corporate Social Responsibility and Citizenship Report—to showcase ConAgra's sustainable and environmentally-friendly brand.[2] That effort, Plaintiffs

---

[2] *See, e.g.*, Dkt. 27 ¶ 24 ("ConAgra's Brand Manager for Frozen Prepared Food, Logan Soraci, emphasized the importance of ConAgra's sustainability marketing campaign stating, 'Sustainability is no longer a 'nice to have' it's a must.'"); ¶ 29 ("ConAgra's Brand Manager for Frozen Prepared Food highlighted the importance of ConAgra's sustainability marketing, stating 'sustainability is part of consumer conversations in a way that they weren't just a few years ago. Part of consumer consciousness. Sustainability is no longer a 'nice to have' it's a must.'"); ¶ 30 ("ConAgra's Senior Director of Sustainability, Katya Hantel, discussed ConAgra's strategy for communicating its sustainability efforts on the brand level, stating: 'We spend a lot of time acting as translators and really taking …scientific data and

14

allege, is translated onto the packaging when ConAgra collaborates and advertises its MSC partnership. Plaintiffs then bolster their deceptive advertising claims by pointing to the disconnect between these off-label remarks and the unsustainable fishing practices by MSC-certified fisheries. But Plaintiffs have not shown why these off-label remarks are relevant to a consumer's purchasing decisions. At least, Plaintiffs have not alleged facts showing that *they* relied on these off-label remarks.

In reviewing deceptive advertising, the Court must adopt the perspective of a reasonable consumer and account for all information available to consumers and the context that information is provided. *Bell*, 982 F.3d at 477. That information could be the rest of the packaging, its price, or the general knowledge about the product. *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023). It can be statements or labels on a website if the product is commonly purchased through the Internet. But it goes too far to assume that a reasonable consumer is aware of ConAgra's statements made at an industry, corporate consumer panel or reads interviews from ConAgra's corporate executives. *Cf. Karlinski v. Costco Wholesale Corp.*, 2022 WL 2867383, at *9 (N.D. Ill. Jul. 21, 2022) ("At best, Plaintiff's gesturing to federal regulations surrounding food labeling supports his theory that consumers would be misled.... [T]hat does not help his case much, if at all, because 'average consumers are not likely to be aware of the nuances of the FDA's regulations.'" (citation omitted)). Therefore, the Court's analysis on the deceptive advertising will be limited to ConAgra's packaging.

---

quantif[ying] and turning it into a story that the average consumer can understand.'"); ¶ 35 ("ConAgra describes its Corporate Social Responsibility as 'Nourishing our people, the planet and our communities' and claims that 'We aim to do what's right for our business, our employees, our communities and the world. This means making food that is delicious, safe nutritious and convenient while addressing the key environmental and social impacts linked to our products. We look forward to making good food for generations to come in a way that is consistent with our values.'").

Starting at the front of the packaging, there are two labels—a Blue Tick, stating "Certified Sustainable Seafood MSC," and next to the Blue Tick, a separate phrase, "Certified Sustainably Sourced." Plaintiffs argue that both labels are deceptive because MSC is an ineffective organization that routinely certifies fisheries as sustainable even though they practice unsustainable and environmentally detrimental fishing practices, like using the pelagic trawl. And despite ConAgra repeatedly referencing its aim to create a sustainable and eco-friendly brand, Plaintiffs allege that the company has betrayed that image by sourcing fish from MSC-certified fisheries. Therefore, when reasonable consumers rely on those labels, they are deceived.

Looking at the four corners of the packaging, the Court does not find the labels to be misleading. ConAgra is not advertising that their products are *sustainable*, but that their products are *certified as sustainable* by MSC. This is a distinction with a difference. Plaintiffs do not allege that ConAgra violated MSC standards or that the MSC certification on the packaging is inaccurate. Instead, they argue that those standards authorize or overlook unsustainable fishing practices. But that dispute involves MSC's methodology and the process used to certify fisheries. It is not a description of a false, deceptive, or misleading statement about the product. The Blue Tick does exactly its purpose—the product is MSC-certified. That label is not a lie. *See, e.g.*, *Lee v. Canada Goose US, Inc.*, 2021 WL 2665955, at *6 (S.D.N.Y. June 29, 2021) (finding no deceptive advertisement where the plaintiff only argued that the certification process was unsatisfactory and not whether the defendant was properly certified).

Nor is the phrase "Certified Sustainably Sourced" deceptive. Given its positioning right next to the Blue Tick, a reasonable consumer would not construe the phrase to be an independent advertisement from ConAgra. Rather, it repeats Blue Tick's messaging that MSC certified the product as sustainably sourced.

16

Turning to the back of the packaging, at the top, it states "Good for You. Good for the Environment." Looking lower, there are six labels separated by green or blue lines. Plaintiffs argue that the Blue Tick, the phrase "We have full traceability of all our fish," and the line "Good for the Environment" are misleading. As discussed, the Blue Tick is not a deceptive label. ConAgra argues that the "full traceability" representation is also not misleading because the company follows MSC's chain-of-custody standards. But that argument only has force if the Court assumes that the "full traceability" representation is connected to the MSC certification. Viewing the whole back packaging, that connection is unclear. First, all six labels are separated by lines, suggesting that each label offers an independent promise and is unrelated to one another. For example, a reasonable consumer would not affiliate the Blue Tick with the grams of protein per serving. Second, contrary to the front packaging where the two labels were close together, there is an intermediate label in between the "full traceability" representation and the Blue Tick. That separation undermines ConAgra's position that the Blue Tick somehow informs or clarifies the traceability representation. *See, e.g.*, *Rawson*, 2022 WL 1556395, at *2 (noting that the physical attributes of the labels suggest that the BAP label is not connected to and does not clarify ALDI's sustainable representation).

But even if the traceability representation is separate from the Blue Tick, the Court is not convinced that the representation is misleading. According to Plaintiffs, "effective traceability can be defined as the ability to identify the origin of the product and sources of input materials, as well as the ability to conduct backward and forward tracking using recorded information to determine the specific location and history of the product." (Dkt. 27 ¶ 62). Plaintiffs argue that ConAgra lacks traceability because they would not have otherwise condoned the unsustainable fishing practices, like pelagic trawl and ghost gear. But the Court fails to see the connection between

17

unsustainable fishing practices that harm the marine ecosystem and ConAgra's ability to trace the path of the pollock from the time of capture to the frozen food packaging. The former requires the latter, but Plaintiffs have not shown the reverse to be true. Plaintiffs have not alleged sufficient facts to suggest that ConAgra cannot identify the origin of the pollock or track the history of the sourcing process. It could be that ConAgra is aware of the unsustainable fishing practices and is trying to resolve the problem. Or ConAgra believes those fishing practices are sustainable. Either scenario can exist with ConAgra's traceability representation.

But the Court does find one problematic line: "Good for the Environment." The line is featured prominently at the top of the back packaging and appears unconnected to the Blue Tick or any MSC-related certification or standards. Indeed, a reasonable consumer could read the line as a separate purported commitment by ConAgra, not by MSC, that their products are good for the environment. *See, e.g.*, *Lee*, 2021 WL 2665955, at *7 (noting that a separate commitment to ethical sourcing is plausibly deceptive even if compliance with third-party standards was not misleading).

ConAgra downplays the line as nonactionable puffery—"an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Rawson*, 2022 WL 1556395, at *3 (quoting *Kacocha v. Nestle Purina Petcare Co.*, 2016 WL 4367991, at *16 (S.D.N.Y. Aug. 12, 2016)). The Court looks at two factors to determine if a commercial statement is puffery: (1) whether the statement makes "'objective claims' that describe 'specific or absolute characteristics of a product capable of testing,'" *Evolve Biosystems, Inc. v. Abbott Lab'ys*, 2022 WL 846900, at *5 (N.D. Ill. Mar. 22, 2022) (quoting *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*, 2005 WL 3557947, at *10 (N.D. Ill. Dec. 26, 2005)), and (2) whether a reasonable consumer could rely on the statement when making purchasing decisions. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *see also Speakers of Sport, Inc. v. ProServ,*

18

*Inc.*, 178 F.3d 862, 866 (7th Cir. 1999) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud.").

The Court must approach this phrase the way "real consumers understand and react to the advertising." *Bell*, 982 F.3d at 476. In other words, context matters. ConAgra's puffery argument may have stronger footing if "Good for the Environment" is the only label on the packaging. But in evaluating the whole packaging, ConAgra insinuates that their products are tied to some environmental benefits or at the least, minimize the harmful impact to the environment. *See, e.g.*, *Rawson*, 2022 WL 1556395, at *3 (finding ALDI's sustainable label suggests that the salmon products had some environmental benefit); *see also Bush v. Rust-Oleum Corp.*, 2024 WL 308263, at *4 (N.D. Cal. Jan. 26, 2024) (noting that under California law, "Earth friendly" suggests that the consumer good is "not harmful to, or is beneficial to, the natural environment" (quoting *White v. Kroger Co.*, 2022 WL 888657, at *2 (N.D. Cal. Mar. 25, 2022))).

The packaging features the Blue Tick twice and reaffirms the MSC certification that the fish is "Certifiably Sustainably Sourced." When reasonable consumers see that messaging and then reads that the product is "Good for the Environment," they can infer that the fish is sourced in a manner that is not harmful to the environment. Moreover, ConAgra does not couch the line in any aspirational language, such as "promotes," "aims," or "supports," to suggest that ConAgra is limited in its promise to do good for the environment—it is absolute. *See, e.g.*, *Myers v. Starbucks Corp.*, 2020 WL 13302437, at *4 (C.D. Cal. July 29, 2020) (noting that Quakers uses aspirational language to suggest they have limited control over their supply chain); *Bietsch v. Sergeant's Pet Care Prod., Inc.*, 2016 WL 1011512, at *4 (N.D. Ill. Mar. 15, 2016) ("Instead, Sergeant's has used objectively verifiable terms—as it represents on its own packaging—to present that the Pur Luv Treats are nutritious, safe, and wholesome, despite the fact that they do not dissolve or break down

after canine ingestion."). Consumers have no obligation to question the labels they see on the packaging or parse through its language to determine how "Good for the Environment" should be interpreted. *Bell*, 982 F.3d at 476; *see also id.* ("The district court's dismissal erred by departing from the Rule 12(b)(6) standard and attributing to ordinary supermarket shoppers a mode of interpretation more familiar to judges trying to interpret statutes in the quiet of their chambers."). And although broad, the question of whether a fish is sourced in a manner that benefits, or at least does not harm, the environment can be evaluated and measured.

The Court finds further support from the Federal Trade Commission's (FTC) "Guides for the Use of Environmental Marketing Claims" where the agency instructs marketers to avoid making environmental claims that are unfair or deceptive based on the FTC's "views on how reasonable consumers likely interpret [those] claims." 16 C.F.R. 260.1(a).[3] To the FTC, "[u]nqualified general environmental benefit claims…likely convey that the product…has specific and far-reaching environmental benefits and may convey that the item…has no negative environmental impact." *Id.* at § 260.4(b). Thus, in viewing the total package, the phrase "Good for the Environment" impresses on consumers that the fish was caught in an environmentally friendly manner. But Plaintiffs have alleged sufficient facts to suggest that ConAgra sourced its pollock through unsustainable and harmful fishing practices that is not "Good for the Environment." They argue that the use of pelagic trawls prevents the maintenance of a healthy pollock fish population and harms endangered marine animals. ConAgra also does not require its fish suppliers to mitigate the abandonment or discarding of fishing gear that poses a serious threat to the marine ecosystem.

---

[3] The Court is not suggesting that consumers are aware of the FTC guide when making purchasing decisions. *See, e.g.*, *Curtis v. 7-Eleven, Inc.*, 2022 WL 4182384, at *16 (N.D. Ill. Sept. 13, 2022). Rather, the guide illustrates how "Good for the Environment" "may be unfair and deceptive as an unqualified or not clearly explained environmental marketing claim." *Dorris v. Danone Waters of Am.*, 2024 WL 112843, at *6 (S.D.N.Y. Jan. 10, 2024).

To be clear, ConAgra can offer evidence to show consumers would not be misled by the label. But the ambiguity only suggests that "whether a claim is either false or misleading is an issue of fact rather than law." *Bell*, 982 F.3d at 479 (quoting *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 948 (N.D. Ill. 2009)) (cleaned up). Therefore, the Court finds that "Good for the Environment" is actionable non-puffery and denies ConAgra's motion to dismiss the various states' consumer protection claims.[4]

## B. Equitable California Claims (Counts Four, Five, and Eight)

ConAgra next argues that the Court should dismiss Plaintiffs' request for equitable relief— injunctive relief, unjust enrichment, disgorgement of profits—under California law. ConAgra argues that under *Sonner v. Premier Nutrition Corp.*, equitable remedies in federal courts are not available if there exists an adequate legal remedy. 971 F.3d 834, 844 (9th Cir. 2020). Accordingly, Plaintiffs have not alleged why the monetary damages they seek is an inadequate legal remedy.

As discussed, Plaintiffs do not have standing to pursue injunctive relief. But several cases have limited *Sonner* as having "minimal application at the pleading stage." *Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023); *see also Nacarino v. Chobani, LLC*, 2022 WL 344966, at *9–10 (N.D. Cal. Feb. 4, 2022); *Johnson v. Trumpet Behavioral Health, LLC*, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022)). *Sonner* presents an extreme example where the plaintiff amended her complaint "on the eve of trial to drop the damages claim and seek only equitable restitution." *Nacarino*, 2022 WL 344966, at *9. The case only suggests that in the later stages of litigation, "a plaintiff…cannot create an inadequacy of a legal remedy by eliminating its availability by taking volitional action." *Id.* As the parties are still in the pleading stage, it is still

---

[4] ConAgra makes an additional argument that the MSC certification is not deceptive because the packaging includes a URL to MSC's website and consumers can visit the site for additional context. ConAgra's argument is moot because the Court found the MSC certification to be non-deceptive on its face.

too early to determine whether monetary damages will be adequate. *Johnson*, 2022 WL 74163, at *3; *Murphy*, 651 F. Supp. at 1129 ("*Sonner* does not require Plaintiffs to 'demonstrate' anything at the pleadings stage.").

ConAgra makes a separate argument that Plaintiffs' unjust enrichment claim should be dismissed because it cannot be a stand-alone cause of action. Since the Court did not dismiss Plaintiffs' state consumer protection claims, the unjust enrichment claim does not stand alone.

Therefore, the motion to dismiss Counts Four and Five are granted in part and denied in part. The motion to dismiss Count Eight is denied. Plaintiffs can pursue equitable relief for now, but their request for injunctive relief is denied.

## C. VCPA (Count Six)

ConAgra also argues that Plaintiffs' claim under the Virginia Consumer Protection Act (VCPA) fails because the VCPA only allows for "individual action[s]." Va. Code Ann. § 59.1-204(A); *see Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 667–88 (N.D. Cal. 2019). More generally, "Virginia jurisprudence does not recognize class actions." *Casey v. Merck & Co.*, 722 S.E.2d 842, 846 (Va. 2012). Plaintiffs counter by arguing that some district courts have recognized class action claims under the VCPA. *See, e.g.*, *Attias v. CareFirst, Inc.*, 344 F.R.D. 38, 56 n.6 (D.D.C. 2023). Alternatively, Plaintiffs argues that the pleading stage is not the proper time to address this question. *See, e.g.*, *Attias v. CareFirst, Inc.*, 518 F. Supp. 3d 43, 56 n.8 (D.D.C. 2021).

The Court cannot address this question right now, not because the pleading stage is the inappropriate time to rule, but rather, the parties have not meaningfully engaged with the merits of the question. Whether a plaintiff can bring a claim under the VCPA in a class action depends on the characteristic of the class action ban—procedural or substantive. In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, Justice Stevens notes that federal courts sitting in

22

diversity applies state substantive law and federal procedural law.[5] 559 U.S. 393 at 417 (2010). But it does not mean that "federal rule always governs." *Id.* Under the Rules Enabling Act, federal courts cannot use federal rules to "abridge, enlarge, or modify" any state's definition of its own substantive rights and remedies. *Id.* (quoting 28 U.S.C. § 2072(b)). A state procedural law "may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Id.* at 420. In such a case, state law would displace federal law. *Id.*

Thus, the question here is whether the VCPA's class action ban is a procedural or substantive rule. Neither party addressed this argument, engaged with VCPA's statutory text and legislative history, or discussed *Shady Grove* and its progeny. The Court separately notes that several district courts have found the VCPA's class action ban to be procedural and therefore, preempted by Rule 23. *See, e.g.*, *Attias*, 344 F.R.D. at 57 n.6; *Tijerina v. Volkswagen Grp. of Am., Inc.*, 2023 WL 6890996, at *32 (D.N.J. Oct. 19, 2023); *Milisits v. FCA US LLC*, 2021 WL 3145704, at *12 (E.D. Mich. Jul. 6, 2021); *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 574 (M.D. Tenn. 2020); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *27 (N.D. Cal. Sept. 14, 2016), *on reconsideration in part,* 2016 WL 6873453 (N.D. Cal. Nov. 22, 2016); *In re Hardieplank Fiber Cement Siding Litig.*, 2013 WL 3717743, at *17 (D. Minn. July 15, 2013).

Perhaps these cases are right, but none of them analyzed the text of the VCPA. For example, the referenced cases all cite *In re Hardieplank Fiber Cement Siding Litig.*, where the court reasoned that the "absence of a class action right under the VCPA is the 'default' position

---

[5] *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.* resulted in a 4-1-4 split in the opinions. Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193. As Justice Stevens's concurred on the narrowest ground in *Shady Grove*, his concurrence controls.

under Virginia law, rather than a provision of the VCPA itself." 2013 WL 3717743, at *17. Therefore, "the lack of a class action mechanism is a procedural matter, rather than a substantive law defining the types of rights and remedies available under the VCPA itself." *Id.* Yet, as ConAgra notes, VCPA's section title states "*Individual* action for damages or penalty," Va. Code. Ann. § 59.1-204 (emphasis added), suggesting that only individuals may bring a claim. Moreover, another district court upheld Tennessee Consumer Protection Act's (TCPA) ban on class actions based on similar language—the substantive statute states "[a]ny person who suffers an ascertainable loss of money or property [under the TCPA]…may bring an action *individually* to recover actual damages." Tenn. Code. Ann. § 47-18-109(a)(1) (emphasis added); *Bearden v. Honeywell Int'l Inc.*, 2010 WL 3239285, at *8 (M.D. Tenn. Aug. 16, 2010) ("The very statutory provision that authorizes a private right of action for a violation of the TCPA limits such claims to those brought 'individually.'") (citation omitted).

The conflicting reasonings highlight the complexity of this question. At the very least, the Court cannot opine on this issue based on what the parties have filed. Therefore, the Court reserves its ruling on this part of ConAgra's motion pending additional briefing described below.

## CONCLUSION

For the foregoing reasons, ConAgra's motion to dismiss [30] is granted in part and denied in part. Plaintiffs' claim for injunctive relief is dismissed, but they can continue to pursue their remaining claims. The Court requires additional briefing on whether the VCPA ban on class actions is a procedural or substantive right, so ConAgra's motion is taken under advisement to that extent. By 4/8/24, ConAgra shall submit a brief of no more than 15 pages on the subject, and Plaintiffs have until 4/22/24 to file a response of no more than 15 pages. ConAgra shall not file a

reply unless ordered by the Court. Thereafter, the Court will review the parties' submissions and rule on the remainder of ConAgra's motion.


Virginia M. Kendall
United States District Judge

Date: March 25, 2024